2019 IL App (1st) 181422

No. 1-18-1422

Third Division
June 28, 2019

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| JOHN CANNICI, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CH 12700 |
| | ) | |
| THE VILLAGE OF MELROSE PARK, THE | ) | Honorable |
| BOARD OF FIRE AND POLICE | ) | Neil H. Cohen, |
| COMMISSIONERS OF MELROSE PARK, | ) | Judge, presiding. |
| MICHAL CAPUTO, Commissioner; MARK | ) | |
| RAUZI, Commissioner; PASQUALE | ) | |
| ESPOSITO, Commissioner; RICHARD | ) | |
| BELTRAME, Individually and in His Official | ) | |
| Capacity as Melrose Park Fire Chief; | ) | |
| RONALD SERPICO, Individually and in His | ) | |
| Official Capacity as Mayor of Melrose Park, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| (The Village of Melrose Park, The Board of | ) | |
| Fire and Police Commissioners of Melrose | ) | |
| Park, Michal Caputo, Mark Rauzi, Pasquale | ) | |
| Esposito, and Richard Beltrame, Defendants- | ) | |
| Appellees). | ) | |

JUSTICE COBBS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1      Plaintiff, John Cannici, appeals the circuit court order affirming the decision of the Board of Fire and Police Commissioners of Melrose Park (Board) to terminate his employment as a firefighter for violation of the residency requirement set forth by local ordinance No. 2.52.020. Melrose Park Municipal Code § 2.52.020 (adopted 1997). He further challenges the circuit court's failure to provide any remedy despite finding that there was a due process violation during the administrative proceedings. Cannici requests that this court vacate the Board's decision, order his reinstatement with back pay, and award him attorney fees.

¶ 2                                      I. BACKGROUND

¶ 3      Richard Beltrame, the fire chief of the Village of Melrose Park, filed an official statement of charges against Cannici on June 28, 2016.Chief Beltrame alleged that Cannici did not maintain a *bona fide* residence in Melrose Park because it was not his principal place of residence and abode. Chief Beltrame submitted the matter to the Board to set a hearing date and take appropriate actions in accordance with the Board's rules and regulations and the Illinois Municipal Code (see 65 ILCS 5/10-2.1-17 (West 2016). Cannici was charged with violating the residency ordinance, which required that

> "[e]ach and every officer and employee of the village, unless exempted by this chapter, must be a resident of the village as that term has been defined herein. \*\*\* Each and every employee must maintain resident status during his or her period of employment." Melrose Park Municipal Code § 2.52.020 (adopted 1997).

The Village ordinance defines residence as "a dwelling place used as a home, located within the corporate boundaries of the village, and includes single-family dwellings, rental apartments and property, mobilehomes, condominiums, and dwelling units in multifamily, multidwelling or multipurpose buildings." Melrose Park Municipal Code § 2.52.010 (adopted

1997). Correspondingly, a resident is defined as "a natural person who occupies a residence, as hereinbefore defined, as his or her principal place of residence and abode." Melrose Park Municipal Code § 2.52.010 (adopted 1997). Under the rules and regulations of the Board, Cannici's failure to abide by the residency ordinance[1] was cause for termination.

¶ 4                                    A. Board Proceedings

¶ 5        Cannici was the only witness called at the hearing before the Board, and the evidence adduced was as follows. Cannici was raised in Melrose Park, left the village for college, and returned after completing his bachelor's degree. In 2000, around the same time he began his employment with the Village, he purchased and moved into a duplex at 1722 Broadway Avenue, Melrose Park. In 2002, he married, and his wife also moved into the duplex. A year later, Cannici purchased a two-story single family home at 906 Norwood Street, Melrose Park, and sold the duplex in anticipation of growing his family. His son was born in 2004, followed by his daughter in 2006. The Cannici family lived together at the Norwood house until 2008.

¶ 6        In 2008, Cannici purchased a second house in Orland Park. According to Cannici, the new property was an investment property. Nonetheless, his wife and two children moved into the new house and had no intention of returning to the Norwood house. From 2008 through the spring of 2013, Cannici testified that he lived in the Norwood house alone and would spend the weekends with his family in Orland Park. He and his wife had no marital problems and were not living separately in anticipation of seeking a divorce.

---

[1]The statement of charges also alleged that Cannici violated the residency clause of the collective bargaining agreement; however, the agreement is not included in the record on appeal, nor is it addressed by either party.

¶ 7    Cannici's wife had many ties to the Orland Park community. Her parents and sister lived there, she was registered to vote there, she had long worked in the area, and in 2007 she became the owner of an Orland Park hair salon. Cannici and his wife agreed that they would live separately. The decision came after the couple worried about the children starting school and their work schedules interfering with school pick-ups and after-school care. They believed that moving the children to Orland Park, so that the children's maternal grandparents and aunt could offer more assistance, was the best solution.[2] Thus, the children moved to Orland Park with their mother and enrolled in school as "in-district" students.

¶ 8    Two years into this living arrangement, Cannici hired a realtor and listed the Norwood house for sale. For the next three years, Cannici demonstrated a persistent effort to sell the Norwood house. He renewed his contract with the realtor twice and periodically lowered the sales price. Throughout this time, he continued to live in the Norwood house alone. He explained that, as the only one using the house in Melrose Park, he planned to sell the house in order to buy a smaller place. In May 2013, Cannici abandoned his efforts to sell the house after the third sales contract expired, entered a leasing agreement with John and Angellica Cichon, and moved into the Orland Park house with his family.

¶ 9    The "Basic Rental Agreement or Residential Lease" signed on May 26, 2013, designated the Cichons as temporary residents with the lease running from June 1, 2013 through May 31, 2014. Rent payments of $1400 each month were due to Cannici at his Orland Park house by the fifteenth of each month, and the lease would automatically renew on a month-to-month basis after May 31, 2014. Either party could submit written notice 30 days prior to the desired end date in order to terminate the month-to-month contract. The lease further

_____

[2]Although Cannici's parents had lived in Melrose Park for a period of time, Cannici testified that in 2008, he no longer had any family living in Melrose Park that could help with childcare.

provided that the Cichons would be responsible for payment of utilities and property maintenance needs such as plumbing, mowing, or snow removal. According to the inventory clause, Cannici left a washer, dryer, some wicker furniture, and a coffee table on the premises that the Cichons were authorized to use. Additionally, a handwritten clause provided, "Temporary Resident shall have use of laundry room only in the basement of premises." Cannici explained that he wanted to be clear that the Cichons were only renting the main floors. The basement remained his space, as he left a number of personal items there and only granted limited permission to enter the basement for using the laundry machines. Cannici also explained that he reserved a right of entry into the Norwood house in his arrangement with the Cichons. The lease, however, only provided for entry with notice in regards to showing the premises to prospective renters, buyers, and lenders or for inspections and repairs. Entry without notice was only provided for by the lease in cases of emergency or suspected abandonment.

¶ 10       Although he physically lived at the Orland Park house throughout the term of the rental lease, Cannici continued to use the Norwood house as his mailing address for a number of items, and he would call whenever he intended to drop by to pick up his mail. In support of his claim of maintaining his residency, Cannici submitted over 600 pages of documents, which included his bills, credit card and investment statements, voter registration, retirement benefits, etc., which continuously listed the Norwood house as the mailing address between 2013 and 2016.

¶ 11       During the hearing, Cannici testified regarding an e-mail between himself and his realtor, from November 30, 2010, in which the realtor asked Cannici if he knew anyone who would be interested in a one-bedroom apartment, available at the beginning of 2011. Cannici

responded the next day, "I will take it if we could sell before then." The realtor also asked if Cannici wanted to rent out the Norwood house, to which Cannici offered no response. Cannici explained in his testimony that he had received several inquiries as to whether he was willing to rent out the house; however, he did not initially plan to do so.

¶ 12 He changed his mind in 2013 after he was approached by a neighbor who was a relative of the Cichons. His neighbor explained that he knew of Cannici's situation and thought Cannici could offer some assistance to the Cichons, who had recently suffered a personal tragedy. Cannici explained that, at first, he did not agree to rent to the Cichons because he did not want to "mess with that." Cannici's neighbor approached him a couple more times, and Cannici eventually agreed. Cannici noted that these requests came after the Rahm Emanuel case (*Maksym v. Board of Election Commissioners*, 242 Ill. 2d 303 (2011)) had come out, which he "read up on." He figured that, if "[he] could help this family out and maintain [his] residence" without it being a problem under the Emanuel case, then he would do it. The Cichons moved out shortly before Cannici's interview with the Village's investigators in June 2016. Cannici stated that his move back to the Norwood house was only coincidental to the investigation into his resident status.

¶ 13 The Board determined that cause existed for Cannici's termination where he admitted that he did not live at the Norwood house for this period of three years. The Board ruled that "[t]he residency ordinance is not satisfied by virtue of ownership of the property" where "ownership of the property is not required by the ordinance at all." The Board recognized that Cannici had since moved back into the Norwood house[3] after the investigation was opened but found that continuous residency was required and the three-year gap during his

---

[3]During the course of the administrative review period and related appeals, Cannici has since sold the Norwood house and moved back to the Orland Park house.

employment for the Village constituted a violation of the ordinance. The Board further commented that it rejected the credibility of Cannici's testimony that he terminated the lease with the Cichons coincidentally after the investigation began, and it found that Cannici's actions exhibited an intent to try and emulate the facts of the *Maksym* to improperly circumvent the Village ordinance.

¶ 14                                B. Administrative Review

¶ 15        Cannici filed a verified complaint for administrative review challenging the Board's decision to terminate him based on the ordinance violation. Cannici argued that his residency had been clearly established and could only be lost if the Village demonstrated his physical absence and intent to abandon. He asserted that the evidence overwhelmingly demonstrated that he had no intention of abandoning his Melrose Park residency. Thus, the Board's decision should be reversed because it was contrary to law, it was an abuse of discretion, it was against the manifest weight of the evidence, and the Board did not comply with the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2016)).

¶ 16        Counts II and III asserted that defendants violated both 42 U.S.C. § 1983 and the fourteenth amendment of the United States Constitution where they acted with malice or recklessly to disregard Cannici's due process and equal protection rights. Specifically, Cannici complained of a due process violation where there were *ex parte* communications between the Board's counsel and the prosecuting attorney. Cannici also complained that the Board disregarded the law, ignored undisputed testimony, and misrepresented the evidence in its decision which further denied him due process. Cannici asserted that defendants also denied him equal protection of the law where they engaged in a pattern of selective investigation and enforcement of the residency ordinance.

¶ 17        The allegations of *ex parte* contacts included when Chief Beltrame was invited to appear before the Board without notice to Cannici to discuss scheduling. In addition to this meeting, Cannici asserts that *ex parte* discussions took place in e-mails sent from the Board's counsel to the prosecuting attorney. In response to the perceived injustice, Cannici's counsel filed a motion for "reappointment of counsel to the Board and disqualification of prosecutor" in combination with a motion to dismiss the statement of charges. This motion was denied by the Board, and no hearing transcript or written opinion regarding the motion is in the record.

¶ 18                              1. Federal Claims in the District Court

¶ 19        Counts II and III were removed to federal court and reviewed by the Eastern Division of the Northern District Court of Illinois. *Cannici v. Village of Melrose Park*, 262 F. Supp. 3d 591 (N.D. Ill. 2017). Defendants filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure (Fed. R. Civ. P. 12(b)(6)), which was granted by the district court. The district court found that, although Cannici had a protected interest in his employment, Cannici did not allege any deficiency in the postdeprivation remedies available to him. The district court explained that under a § 1983 due process claim (42 U.S.C. § 1983 (2012)), an aggrieved party can challenge the established state procedure or the actions of a state employee in implementing the procedure. Cannici's claim entailed challenging the latter, in that defendants failed to implement or abide by the established state procedure in a fair manner. The district court stated that " 'the state's obligation under the Due Process Clause [in such cases] is to provide sufficient remedies after its occurrence, rather than to prevent it from happening.' " *Cannici*, 262 F. Supp. 3d at 594 (quoting *Michalowicz v. Village of Bedford Park*, 528 F.3d 530, 535 (7th Cir. 2008)). Such requirement left Cannici with the option of invoking the state's postdeprivation remedy, review under the Administrative

Review Law (735 ILCS 5/3-101 *et seq.* (West 2016)), or demonstrating that the postdeprivation remedies were inadequate. As Cannici's complaint challenged the adequacy of the predeprivation protections, and Cannici had not yet availed himself of the postdeprivation protections, the district court found dismissal of count II under Rule 12(b)(6) was appropriate.

¶ 20    The district court next found that Cannici's equal protection claims were foreclosed by the Supreme Court's decision in *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008). Thus, the district court also dismissed count III and remanded the issue to state court for administrative review under count I of the complaint.

¶ 21                                    2. State Circuit Court

¶ 22    After the district court remanded the case to the circuit court, defendants filed their answers to count I and other pleadings. The circuit court issued an order on December 6, 2017, affirming the Board's decision finding that the plain language of the Village's residence ordinance required Cannici to occupy a dwelling place in Melrose Park during his employment, which he did not between 2013 and 2016. The court distinguished the case of *Maksym*, finding that the election residency statute had different requirements than the residency ordinance and thus was inapplicable to the facts before the court.

¶ 23    The circuit court also addressed Cannici's *ex parte* claims, which the court noted were addressed in a footnote rather than the main portions of Cannici's pleadings and thus improperly raised. The court initially stated that the communications between counsel were not *ex parte* communications and, even if considered as such, Cannici had not shown the existence of any bias, such that the members of the Board had prejudged the facts or the law of his case prior to the Board hearing. Cannici moved for reconsideration, arguing that

*Maksym* was wholly applicable to his case and that he had properly raised the issue of *ex parte* communications in his verified complaint for administrative review.

¶ 24     At the January 22, 2018 hearing, the court addressed Cannici's motion for reconsideration and reaffirmed the Board's decision, finding that, as a matter of law, Cannici could not maintain a residency in Melrose Park while living with his family in Orland Park for three years. The court also heard counsel's argument that the Board was biased by virtue of the Board's attorney engaging in *ex parte* communications with the prosecuting attorney. The court noted that it could not see how these communications could void the entire hearing where the evidence against Cannici was overwhelming and the result of the proceeding would be no different had the communications not taken place. The court asked for supplemental briefing on the appropriate remedy in light of finding a due process violation where no prejudice can be shown, rejecting the idea that Cannici could be given "a total pass." The court further noted that it did not see a cause of action for monetary damages under a due process argument before it, which counsel later explained was currently pending before the Seventh Circuit. The court then ordered the issue of due process remedies to be held in abeyance until the federal court issued its decision.

¶ 25                         3. Federal Claims at the Seventh Circuit

¶ 26     Cannici's appeal of the district court's decision to the Seventh Circuit was rejected. *Cannici v. Village of Melrose Park*, 885 F.3d 476 (7th Cir. 2018). The Seventh Circuit affirmed the analysis applied by the district court and highlighted that "we have found time and again that the Illinois [Administrative Review Law] provides sufficient post-deprivation relief." *Id*. at 480. The court also wrote:

"Cannici does not contend that his rights under the [Administrative Review Law] have not been afforded to him. In fact, his counsel brought to our attention that the state court judge has found the administrative review claim in his favor and deferred further proceedings pending this Court's decision. Thus, we have no reason to believe Cannici has been deprived of his due process rights." *Id.*

Therefore, the district court's dismissal of counts II and III was affirmed.

¶ 27                    4. Remedy in the State Circuit Court

¶ 28     During the abeyance period, Cannici filed a motion for discovery, which the court heard on May 7, 2018. Cannici's counsel represented to the circuit court that, if the court needed to make a finding of prejudice stemming from the due process violation, then Cannici needed access to discovery in order to prove the Board's bias. The court and Cannici's counsel then discussed what matters were actually pending before the court and disagreed over whether the due process claim was properly before the court. In reviewing the claims in the verified complaint, the court noted that it had already dealt with the request for administrative review in count I and the federal courts had dismissed counts II and III of the complaint. Counsel attempted to argue that the Seventh Circuit's ruling on the federal due process claim indicated that the federal court expected the circuit court to deal with the due process claim under count II.

¶ 29     The court took issue with the representations counsel may have made to the Seventh Circuit regarding the court's findings but nevertheless found that the opinion clearly spelled out the end of Cannici's count II. Cannici's counsel responded that there still needed to be a clear finding on count II and that the circuit court was required to make the finding. The court reiterated that the federal courts held that Cannici had no cause of action under the

federal due process claim where "you are given a review under the APA" thus the concern is "not if you win, but if you get the review you're entitled to under Count 1, that that satisfies the problem you're raising under count 2." Furthermore, the court highlighted that Cannici had failed to raise any state due process claims regarding the Illinois Constitution. The court then entered and continued the motion for discovery to the hearing date set for supplemental briefing on the remedy issue.

¶ 30    On June 4, 2018, the parties appeared before the circuit court again to discuss the remedy after it found there had been a procedural due process violation. The court highlighted that the *ex parte* contacts did not constitute a substantive due process violation, nor did it consider this a chance to reargue the merits of the case. Thus, the hearing was limited to discussing the appropriate remedy to address the improper *ex parte* communications, which amounted to a procedural error. In particular, the court noted,

> "What proof do you have that the tribunal itself was unfair? *** [Board's counsel] spoke to the prosecutor who was going to appear before the board and as a result thereof violated his duty *** Okay. It's, again, lamentable. It's not, you know, the worst thing that has ever happened in the history of the world. It's not something that, however, I should ignore and I don't ignore it. But that's not proof that the board was prejudice[d] ***."

The court concluded that it would not make presumptions about the Board based on counsel's actions. Furthermore, because the evidence of the ordinance violation came directly from Cannici himself, the court found that rehearing of the matter before an unbiased panel would not change the outcome. Thus, the court denied the request for discovery to

prove the Board's prejudice and any remedy in light of the overwhelming evidence that would result in Cannici's termination regardless of whether the procedural error was cured.

¶ 31                                          II. ANALYSIS

¶ 32     On appeal, Cannici asks this court to determine what rule of law applies in the enforcement of a residency ordinance. He contends that the Board's interpretation of the ordinance is at odds with the standard set forth by our supreme court in *Maksym*. Cannici further requests that this court find that his due process rights were violated and argues that he should be afforded a remedy in the form of reinstatement with back pay and attorney fees.

¶ 33                                      A. Resident Status

¶ 34     Cannici asserts that his resident status was irrefutably established and the question before the Board and courts of review turns solely on whether he abandoned his resident status during the three-year period he leased his Norwood house to the Cichons. Cannici contends that, in order to find an ordinance violation, the Village had to prove that he acted with the intent to abandon his residency. Cannici argues that the Village failed to meet its burden of proof and therefore the Board's decision to terminate him for violating the residency ordinance was improper. Defendants respond that the residency ordinance at issue here was stricter than in the cases cited by Cannici and only physical presence, rather than intent, mattered. Furthermore, even if intent was considered, defendants argue that Cannici's actions and the surrounding circumstances supported a finding that Cannici intended to abandon his Melrose Park residency.

¶ 35                                    1. Standard of Review

¶ 36     The Administrative Review Law provides for judicial review of all questions of fact and law presented by the entire record. *DiFoggio v. Retirement Board of the County Employees*

*Annuity & Benefit Fund*, 156 Ill. 2d 377, 380 (1993). Courts cannot consider evidence outside of the record of the administrative appeal. 735 ILCS 5/3-110 (West 2016). An administrative agency's findings of fact will only be reversed if they are against the manifest weight of the evidence, and questions of law are reviewed *de novo*. *DiFoggio*, 156 Ill. 2d at 380-81. We address Cannici's argument about the test for determining residency *de novo* because it involves statutory construction, which is a question of law. See *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 275 (2009) (construing a statute is a pure question of law that we review *de novo*).

¶ 37                          2. Test for Residency

¶ 38         When construing a statute, this court's primary objective is to ascertain and give effect to the intent of the legislature. *Devoney v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 199 Ill. 2d 414, 424-25 (2002). The best signal of legislative intent is the language used in the statute, which must be given its plain and ordinary meaning. *Gillespie Community Unit School District No. 7 v. Wight & Co.*, 2014 IL 115330, ¶ 31. Where the statutory language is clear and unambiguous, the court must give it effect without resort to other tools of interpretation. *Exelon Corp.*, 234 Ill. 2d at 275. It is never proper for a court to depart from the plain language by reading into the statute exceptions, limitations, or conditions that conflict with the clearly expressed legislative intent. *Id.*

¶ 39         In this case, the Melrose Park ordinance required all village employees to maintain their resident status during their period of employment. The ordinance clearly defined a resident as someone who occupies a dwelling place used as a home, within the boundaries of the Village, as one's principal place of residence and abode. Melrose Park Municipal Code § 2.52.010 (adopted 1997). The ordinance did not require ownership, signifying that renting a

property for use as a home was sufficient to comply with the ordinance. The word "occupy" is generally understood to mean take up, seize, or hold possession of, and in the context most relevant to the ordinance, can be understood as to live or stay in a place. Black's Law Dictionary (10th ed. 2014). The word "principal" is generally understood as the chief, primary, or most important. Black's Law Dictionary (10th ed. 2014). Reading the ordinance with these definitions in mind, the requirement is that the primary home that employees of the Village live or stay in must be within the boundaries of the Village throughout their period of employment. It is clear that, for three years, Cannici did not live or stay in his Norwood house despite owning the property. Instead, he lived in a house in Orland Park with his family while renting out the Norwood house. Thus, he did not abide by the ordinance's requirements to be a resident and maintain his resident status during his employment period.

¶ 40     Cannici raises a number of convoluted arguments to challenge this straightforward reading of the ordinance. For example, he argues that the phrase "during his or her period of employment" cannot be equated with the phrase "throughout his or her employment." He argues that reading the ordinance as requiring an employee to maintain resident status "throughout" is both superfluous and renders the ordinance incapable of enforcement. However, the very definition of "during" means "throughout the duration of." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/during (last visited June 25, 2019) [https://perma.cc/TJY5-3NH3]. Thus, the ordinance clearly contemplated that an employee should continuously be a resident as long as he or she continued to be employed by the Village.

¶ 41     He further contends that the term "resident status" is not clearly defined in the ordinance and should be understood as requiring an employee to only establish a residence in the

Village once and, from then on, to continue to intend to maintain his resident status, which he can do as long as he does not demonstrate an intent to "abandon" his residency. Under Cannici's interpretation, because he lived in Melrose Park at one point, as long as he intended to eventually return to Melrose Park, within an indefinite period of time, he could continuously maintain his resident status despite living elsewhere. However, to argue that the addition of the word "status" after resident fundamentally alters the definition of "resident," as provided by the ordinance, is illogical. Here, the requirements to be a resident are clearly defined. The additional requirement of maintaining "resident status" is simply read as maintaining the condition of being a resident.

¶ 42 Cannici argues that a definition of residency cannot mean a requirement of "actually residing" because this definition was previously rejected by the Illinois Supreme Court. The primary issue with Cannici's argument stems from his reliance on case law that crafted a definition for residency where the statute did not define it. In *Maksym*, our supreme court had no alternative but to to discern the legislature's intent where there were no clear definitions of resident or residency in the Illinois Municipal Code. See 65 ILCS 5/1-1-1 *et seq.* (West 2010). Thus, the court had to craft a definition of what it meant to "reside in" the municipality in order to be eligible for municipal office. *Maksym*, 242 Ill. 2d at 318. Our supreme court rejected the appellate court's definition of "actually residing" as circular reasoning and a faulty definition for what it means to reside in a municipality. *Id.* at 324.

¶ 43 Unlike the Illinois Municipal Code in *Maksym*, the Melrose Park ordinance clearly defines resident and residence, and it requires its employees to maintain their status as residents during their employment. Thus, we find no reason to depart from the plain language by reading into the ordinance definitions and tests drawn from other cases that conflict with

the clearly expressed legislative intent. We find that the Board properly interpreted and applied the Village ordinance and correctly found Cannici in violation of the ordinance due to the three-year period he did not live in his Norwood house during his employment as a village firefighter.

¶ 44     Having found that Cannici's testimony demonstrated a clear violation of the residency ordinance, we need not address Cannici's arguments that the Board improperly inferred intent to abandon his residency due to his failed attempts to sell the Norwood house. We also briefly note that Cannici's arguments—that a test based solely on physical absence is unenforceable and unfair where he was away from the Norwood house during "some of his non-working hours"—are a mischaracterization of the Board's findings. The Board did not indicate that it found fault with Cannici's earlier arrangement where he lived in the Norwood house for a majority of the week and would spend his weekends at the Orland Park house. Although this arrangement included physical absence from the Norwood house for "some" of the time, this was not a violation of the residency ordinance, as he still lived in the Norwood house for the majority of his time and treated it as his primary home or abode. However, when he leased the Norwood house to the Cichons, he no longer used the Norwood house as his primary home and spent practically no time in the Norwood house, except the time spent picking up his mail.

¶ 45                                          3. Intent

¶ 46     Even assuming that the *Maksym* test involving intent should be employed here, we would reject Cannici's attempt to draw parallels between himself and the parties involved in *Maksym*. The test in *Maksym* provided that assessing whether residency was established required "(1) physical presence, and (2) an intent to remain in that place as a permanent

- 17 -

home." *Id.* at 326. Furthermore, once established, the presumption is that residency continues until the contesting party can demonstrate that residency has been abandoned. *Id.* In like manner, establishing abandonment of residency requires a showing of intent contrary to the intent to remain in a place as a permanent home. *Id.* Intent is "shown primarily from [an individual's] act" and can be supported by the individual's testimony as to intention, although such testimony is not necessarily conclusive. *Id.*

¶ 47    In *Maksym*, Emanuel purchased a home in Chicago in 1998 and lived there with his family from 1998 through January 2009. *Id.* at 306. After receiving an appointment to serve as chief of staff to the President of the United States, Emanuel moved to Washington, D.C. alone, while his family remained at the Chicago house from January to May 2009. *Id.* at 307. Emanuel's family later joined him Washington, D.C., and they lived in a house, which was leased from June 1, 2009, through June 30, 2011. *Id.* The family had moved most of their clothes and personal belongings to Washington, D.C., and received their mail there rather than the Chicago house. *Id.* They leased the Chicago house to another family, although they left furniture and over 100 boxes of personal possessions in the Chicago house. *Id.* The lease was to run from September 1, 2009, through June 30, 2011. *Id.* During his time in Washington, D.C., Emanuel continued to pay property taxes and list his Chicago house as his address on his driver's license, personal checks, and voter registration. *Id.* Emanuel resigned his post as chief of staff on October 1, 2010, and returned to Chicago, entering a lease to live in an apartment in Chicago for the duration of the other family's lease on his Chicago house. *Id.* Emanuel testified that his intention was always to return to living in the Chicago house after serving the President for approximately 18 to 24 months. *Id.*

¶ 48      Cannici highlights his similarities with Emanuel, in that he maintained ownership of the Norwood house, continued to pay property taxes, and listed the house as his mailing address on a number of important documents. He also points out that the lease to the Cichons was intended to be on a temporary basis, for a one-year term. He argues that the conditions surrounding the entering of a lease were not driven by his decision to move out but were intended to help a struggling family, in a similar manner to how Emanuel's move was dictated by outside forces calling on him to serve the President. Cannici further contends that his decision to leave personal items and furniture at the Melrose Park house indicated his intent to return, which was underscored by his undisputed testimony that he intended to return to live in Melrose Park.

¶ 49      However, Cannici glazes over an important distinction between himself and Emanuel that is essential to the determination of intent. In Emanuel's case, he and his family moved into other units that were leased on a temporary basis with the end dates coinciding with the lease of his Chicago house to another family. In contrast, Cannici moved into a second house that he owned and that his wife and children had been living in as their permanent home. His family had no intention of returning to the Norwood house, as they were working and attending school in Orland Park and intended to continue doing so even after the Cichons moved out.

¶ 50      Notably, the facts and circumstances surrounding Cannici's living arrangements fall more in line with an example provided in the *Maksym* decision, which our supreme court stated would establish abandonment:

"[I]f an Illinois resident accepts a permanent job with an out-of-state corporation, purchases a house in a new state, moves his or her family into the new house, moves all

of his or her belongings out of the old house and into the new one, and then rents out the old house on a one-year lease with a right to renew, it clearly could be said that this was an abandonment of the Illinois residency." *Id.* at 329.

Although Cannici had not accepted a permanent job outside of Melrose Park, he purchased a house in another city, moved his family and the majority of his belongings into the new house, and entered a one-year lease that allowed for automatic month-to-month renewal. Cannici's testimony that he intended to return to Melrose Park, alone, and maintain his resident status is contradicted by the above facts and circumstances. Thus, even applying the *Maksym* analysis, we would find that Cannici violated the residency ordinance and was justifiably terminated from his position as a village firefighter.

¶ 51                                B. Due Process Challenge

¶ 52        In a separate challenge to the validity of the Board's decision, Cannici contends that he was denied due process of the law by the actions of the Board's attorney. He further argues that the circuit erred in holding that he was required to demonstrate specific prejudice in order for the court to grant relief on his due process challenge, after the circuit court agreed that a due process violation had, in fact, occurred. Cannici asserts that the appropriate remedy cannot involve a rehearing, as the Board will continue to be biased against him, and the only option for this court is to order him reinstated to his position as a firefighter for the Village with back pay.

¶ 53        The Village and Board contend that Cannici has misstated the law because a finding of a due process violation does not *ipso facto* entitle one to a remedy. Defendants maintain that a

showing of prejudice must be made, except in cases of structural[4] error, in order to reverse the Board's determination. Moreover, defendants assert that, even if there was an issue with the proceedings before the Board, Cannici's due process rights were protected by his right to administrative review by a neutral adjudicator in both the circuit court and this court.

¶ 54    As a preliminary matter, we note that we review the decision of the administrative agency, not the circuit court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531(2006). Thus, the circuit court's findings and alleged failure to provide a remedy are irrelevant to our analysis. Secondly, we review whether this due process claim is properly before this court. Cannici's due process claim under 42 U.S.C. § 1983 and the fourteenth amendment were clearly dismissed from the complaint by the federal courts. In spite of the dismissal of count II, Cannici contends that there is a due process claim still pending, as he has consistently alleged a violation of the due process clause of the Illinois Constitution under count I of his complaint seeking administrative review of the Board's decision. In his verified complaint, Cannici referred to and attached a copy of his motion before the Board to dismiss or, in the alternative, replace and disqualify the attorneys involved as part of his factual summary. He also included a summary of the alleged *ex parte* contacts. However, in the actual allegations listed under count I, Cannici makes no reference to due process under the Illinois Constitution or to the Board's denial of his motion. Count I only alleges that reversal of the Board's decision is warranted because it was contrary to law, it was an abuse of discretion, it was against the manifest weight of the evidence, and it failed to comply with section 3-104 of the Administrative Review Law (735 ILCS 5/3-104 (West 2016)). This cited

---

[4]Cannici does not claim structural error, such as a judge who is financially interested in the case or a total deprivation of the right to counsel in criminal cases.

section addresses the powers of the courts of review on a request for administrative review and does not govern the manner in which the Board should proceed.

¶ 55    In the entire complaint, due process is only mentioned in count II, which was dismissed, and briefly in the beginning of his complaint where he describes the Board as responsible for conducting administrative hearings in accordance with its rules and regulations, the Municipal Code of the Village of Melrose Park, and due process. Cannici did not indicate any intent to challenge the Board's decision for violating due process under the Illinois Constitution, nor does he seek review of the Board's decision to deny his motion to dismiss or, in the alternative, to disqualify and replace counsel. However, the Administrative Review Law provides for judicial review of all questions of fact and law presented by the entire record (*DiFoggio*, 156 Ill. 2d at 380), and in the interest of a complete review, we will address his claim that the *ex parte* communications tainted the Board's decision.

¶ 56                                    1. Prejudice

¶ 57    Regardless of whether we agree with Cannici that there were *ex parte* communications, we find that there is no cause to reverse the Board's decision to terminate him. The presumption is that the administrative officers were objective and capable of judging the controversy fairly. *Waste Management of Illinois, Inc. v. Pollution Control Board*, 175 Ill. App. 3d 1023, 1040 (1988). Even if we impute counsel's actions to the Board, as an agent of the Board, an agency's decision will not be reversed absent a showing of prejudice to the complaining party. *Id.* at 1043. Bias or prejudice is shown only where a disinterested observer might conclude that a member of the administrative body "had in some measure adjudged the facts as well as the law of the case in advance of hearing it." *Sangirardi v. Village of Stickney*, 342 Ill. App. 3d 1, 11-12 (2003). After thoroughly reviewing the record,

we are convinced that plaintiff did not suffer prejudice from the alleged *ex parte* communication in the course of the administrative proceedings. There is no reason to believe that the Board's decision to terminate was driven by any improper prejudgment of the case. In the e-mails complained of, counsel for the Board referred counsel for the Village to citations for two cases. However, the e-mail itself contained no discussion of the cases or their application. The e-mails simply gave the citation and nothing else. This does not indicate any particular judgment on the facts of Cannici's case prior to the hearing. In a separate e-mail, counsel for the Board did provide some case analysis; however, this was in regards to a procedural matter as to timeliness in light of a party seeking a continuance. This, again, does not exhibit a prejudgment of the facts of Cannici's case. Similarly, the hearing[5] for which Cannici complains he was not given proper notice only addressed scheduling matters and did not involve any discussion of substantive issues in the case.

¶ 58                                C. Attorney Fees

¶ 59        We summarily reject Cannici's requests for attorney fees pursuant to 42 U.S.C. § 1988(b) (2012) and section 5 of the Illinois Civil Rights Act of 2003 (740 ILCS 23/5(c)(2) (West 2016)). The former provides for attorney fees, at the court's discretion, to the prevailing party in actions or proceedings to enforce certain provisions of federal law such as 42 U.S.C. § 1983, which Cannici raised in his verified complaint. However, as these claims were dismissed by the federal courts, Cannici was not the prevailing party and is not entitled to attorney fees under § 1988(b). The latter provides for attorney fees and costs to the prevailing party in any action brought to enforce a right under the Illinois constitution or a discrimination claim on the basis of race, color, national origin, or gender. Cannici was

_____

[5]There is no report of proceedings from this hearing, and this conclusion is based on the representations of defendants.

neither the prevailing party in this action, nor did he allege a discrimination claim on the basis of a protected class or a cause of action arising under the Illinois Constitution. Thus, he is not entitled to attorney fees under section 5(c)(2).

¶ 60                                    III. CONCLUSION

¶ 61         For the reasons stated, we affirm the circuit court and the decision of the Board.

¶ 62         Affirmed.