2021 IL App (1st) 181562

No. 1-18-1562

Opinion filed December 23, 2021

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| JOHN CANNICI, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CH 2884 |
| | ) | |
| THE DEPARTMENT OF EMPLOYMENT SECURITY | ) | |
| BOARD OF REVIEW; JACK CALABRO, Chairman of | ) | |
| the Department of Employment Security Board of | ) | |
| Review, Individually and in His Official Capacity; | ) | |
| HENRY WINFIELD, MARIA PEREZ, RAYMOND | ) | |
| NICE, and CAROLYN HOLDER, Members of the | ) | |
| Department of Employment Security Board of Review, | ) | |
| Individually and in Their Official Capacities; and THE | ) | |
| VILLAGE OF MELROSE PARK, ILLINOIS, | ) | Honorable |
| | ) | Ann Collins-Dole, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justices Rochford and Martin concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff John Cannici appeals the circuit court order affirming the decision of defendant

Illinois Department of Employment Security Board of Review (Board) to deny him unemployment

benefits, which he had applied for after defendant Village of Melrose Park, Illinois (Village), terminated his employment as a firefighter for violating the Village's residency requirement. Cannici asks this court to overturn the Board's decision denying him unemployment benefits and order that he receive those benefits.

¶ 2    For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 3                                I. BACKGROUND

¶ 4    The Village employed Cannici as a firefighter from 2000 to 2016. In 2000, he bought a home in the village on Broadway Avenue. After marrying, he sold the Broadway Avenue home and in 2003 purchased a house on Norwood Street in the village. Cannici and his wife had children and continued to live in the village house until 2008.

¶ 5    In 2008, Cannici purchased a house in Orland Park. His wife and the children lived in the Orland Park house while Cannici lived in the village house.

¶ 6    In June 2013, Cannici rented the village house to tenants and lived with his family in the Orland Park house. In June 2016, Cannici learned that his residency was being questioned, and he moved back into the village house after the tenants moved out.

¶ 7    Also in June 2016, the Village fire chief filed written charges against Cannici, seeking termination of his employment for violating the Village's residency requirement by failing to maintain his principal residence in the village. Following an August 2016 hearing before the

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

Although this case was fully briefed by the parties as of February 2019, this case was not designated as ready for review and randomly assigned to a division of this court until September 2021.

Village's board of fire and police commissioners, Cannici's employment was terminated for violating the Village's residency ordinance. Cannici sued the Village over his termination in both federal and state court. His federal action was unsuccessful. *Cannici v. Village of Melrose Park*, 885 F.3d 476 (7th Cir. 2018). His state action also was unsuccessful. *Cannici v. Village of Melrose Park*, 2019 IL App (1st) 181422.

¶ 8     When Cannici applied to the Illinois Department of Employment Security (IDES) for unemployment benefits, the Village protested his application, asserting that he was discharged for misconduct under section 602(A) of the Unemployment Insurance Act (Act) (820 ILCS 405/602(A) (West 2016)). An IDES claims adjudicator determined that Cannici was disqualified from receiving unemployment benefits because he was discharged for misconduct since he had been discharged for violating the Village's residency requirement, which was a known and reasonable rule.

¶ 9     Cannici appealed the claims adjudicator's determination to an IDES referee, and a telephonic hearing was held in October 2016.

¶ 10     Cannici testified and submitted into evidence a newspaper article regarding *Maksym v. Board of Election Commissioners of the City of Chicago*, 242 Ill. 2d 303 (2011), the June 2016 transcript of the Village counsel's interview with Cannici, a copy of the Village's administrative charges, and Cannici's village water bill.

¶ 11     The Village's human resources director testified concerning the authenticity of the Village's documents, and the Village submitted into evidence its residency ordinance, the administrative charges against Cannici, the August 2016 transcript of his discharge hearing before

the Village's board of fire and police commissioners, that board's 2016 decision to terminate Cannici's employment, and Cannici's complaint for administrative review of that decision.

¶ 12    The evidence presented at the October 2016 hearing before the IDES referee showed that Cannici had lived in the village since 1975. He was aware of the Village's residency ordinance when he started working as a firefighter in 2000. Also that year, he bought half of a duplex in the village. In 2003, he sold the duplex unit, and he and his wife bought the village house.

¶ 13    After they had children and their son began school, Cannici and his wife "decided it would be easier and more practical" for his wife and children to live in Orland Park because his wife's business was located in Orland Park and his in-laws who provided childcare also lived there. In 2008, the couple bought a second house, in Orland Park. At that time, Cannici's wife and children moved into the Orland Park house. The children attended Orland Park public schools and paid in-district rates. Cannici's wife was registered to vote in Orland Park and also had her car registered there.

¶ 14    From 2009 through mid-2013, Cannici lived at and was the sole occupant of the village house. Starting in 2010, he put the village house on the market. He reduced the price several times, but the house did not sell. He said, "It stayed on [the market] more or less just because there was no reason *** to take it off. I was going to sell the house and buy something smaller in [the village]." Cannici did not intend that his wife and children would live in the village, but "[t]hey could have." In 2011, Cannici learned of the Illinois Supreme Court's decision in *Maksym*, 242 Ill. 2d 3030. The village house remained on the market until May 2013.

¶ 15    In 2013, a neighbor asked Cannici if the neighbor's relatives could move into Cannici's village house because those relatives were having financial difficulties. Cannici agreed, "as long as they understood that it was a temporary *** situation." The lease agreement for the family said it was a "temporary residence" and reserved most of the basement for Cannici's use. The lease agreement indicated that laundry machines and furniture belonging to Cannici would stay in the village house. He also kept "awards ***, pictures, souvenirs, [and] trinkets" in the village house's basement.

¶ 16    From June 2013 to June 2016, Cannici did not sleep at the village house. Unless he was traveling, he slept virtually every night at the Orland Park house. During the Village's August 2016 hearing to terminate Cannici's employment, he was asked whether he had all of his daily clothes and daily living things at the Orland Park house. Cannici answered: "Well, not all of them, no. But most of them. Some of them." During the October 2016 IDES referee hearing, Cannici said, "I kept everything that was in that house before they moved in was, was still in that house when they moved in." Cannici continued to pay the utilities and taxes for the village house. He continued to use the address of the village house for his mail, including for personal and official business. To retrieve his mail, Cannici had to call the tenants in advance.

¶ 17    Cannici said, "I wanted to make sure that they knew and I knew that this was just a temporary thing. ***  I honestly didn't really realize that they were there, you know, as long as they were. You know, time just kind of flew past."

¶ 18    In May 2016, the Village sent Cannici a notice that it wanted to interview him about his compliance with the residency ordinance. When he told the tenants in the village house that he was

being investigated, "they felt terrible" and said they would move out as soon as they could. After the tenants moved out, Cannici started sleeping in the village house again. He and his wife were not having marital problems. His wife and children did not return to the village house.

¶ 19    Until the Village discharged him in 2016 for violating the residency ordinance, Cannici had never received any complaints or discipline regarding his work performance. Cannici considered himself a resident of the village and never intended to abandon his residency there. He said that he never believed that he was violating the residency ordinance and that he would not have allowed the tenants to move in if he had believed that doing so violated the residency ordinance. According to Cannici, the Village did not provide training on how it interpreted the residency ordinance or ask him during his employment to reaffirm his residency. He said he never had any reason to believe that the Village interpreted its ordinance differently than the Illinois Supreme Court did in similar cases. When the referee asked Cannici why he thought the *Maksym* decision related to residency for employment, Cannici responded: "What's the difference between a politician['s] residence and a *** regular person's residence?"

¶ 20    The referee sustained hearsay objections to Cannici's testimony that he believed he had complied with the residency ordinance because he was aware, and it was common knowledge, that the Village's fire department captain "was allowed to sell his house and move into a house in River Forest with his family." Cannici did not report this information to anybody. He also said he was aware of other firefighters who lived outside the village, including one who lived in Wisconsin.

¶ 21     After the hearing, the IDES referee issued a decision determining that Cannici was discharged for misconduct under the Act. Cannici appealed to the defendant Board, and he and the Village submitted written argument to the Board.

¶ 22     On January 24, 2017, the Board issued a final administrative decision affirming the referee's determination and concluding that Cannici was discharged for misconduct under section 602(A) of the Act. The Board found that from June 2013 through June 2016, Cannici's factual place of abode was with his family in Orland Park. During that time, he travelled to Orland Park each evening after work, ate his meals and slept at his Orland Park home, paid the bills for the Orland Park home, relaxed in Orland Park when he was off work, took his recreation with his family in Orland Park, shopped in the stores in Orland Park, entertained guests in his Orland Park home, and intended in every way to both reside in Orland Park and be domiciled there.

¶ 23     The Board also found that Cannici's conduct was in deliberate and willful violation of the Village ordinance that required him to live in the village. The preponderance of the competent evidence indicated that he knew his conduct violated the Village ordinance. Specifically, when he learned that the Village was investigating his residency, he hastily complied with the Village ordinance by getting rid of the tenants living in his village house and moving back in. The Board stated: "all [of Cannici's] carefully maintained indicia of his supposed residency in [the village] are like fig-leaves on a Roman statue, a pathetic attempt to deceive and cover up a glaring and obvious fact: [f]or a period of 3 years [he] intentionally violated the [employer's] residency ordinance." The Board found that Cannici's violation of the reasonable residency rule harmed the Village by undermining his employer's authority because when employees "flout" their

employer's rules, it creates confusion and morale problems among the offending employees' coworkers.

¶ 24    Cannici filed a complaint in the circuit court for administrative review of the Board's final decision. After briefing and oral argument, the circuit court affirmed the Board's decision, and Cannici timely appealed.

¶ 25                              II. ANALYSIS

¶ 26    Cannici argues that the Board's decision denying him unemployment benefits should be overturned because (1) the Board failed to apply controlling precedent on the issue of abandonment of residency, (2) the decision was clearly erroneous since the evidence established that he intended to maintain his residency in the village, and (3) the Board disregarded the law, which requires proof of willful and intentional conduct and damage.

¶ 27    On administrative review, this court reviews the final decision of the Board—not the decision of the circuit court, the referee, or the claims adjudicator. *Petrovic v. Department of Employment Security*, 2016 IL 118562, ¶ 22. The applicable standard of review depends on the issue presented. *Sudzus v. Department of Employment Security*, 393 Ill. App. 3d 814, 819 (2009).

¶ 28                       A. The Residency Requirement

¶ 29    First, Cannici argues that the Board failed to apply controlling precedent that has interpreted the legal requirements for residency. Cannici argues that the analysis of this issue should be guided by *Maksym*, 242 Ill. 2d at 326, which stated that a person establishes his residency by showing physical presence and an intent to remain in that place as a permanent home; however, once residency has been established, the test is no longer physical presence but, rather,

abandonment. Cannici argues *Maksym* stated that residency is presumed to continue, that the contesting party has the burden to show that residency had been abandoned, and that both the establishment and abandonment of residency is largely a question of intent as shown by a person's acts and testimony. See *id.* According to Cannici, consistent with *Maksym*, he established his principal residency in the Village by living and owning his home there since he became a firefighter in 2000, and his purchase of a home in Orland Park in 2008 and rental of his village house from June 2013 through June 2016 did not show that he intended to abandon his village residency. Cannici asserts that the Board incorrectly inferred that he intended to abandon his village home based on his physical presence in Orland Park.

¶ 30    This issue involves statutory construction, which is a question of law that we review *de novo*. See *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 275 (2009). When construing a statute, our primary objective is to ascertain and give effect to the intent of the legislature. *Devoney v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 199 Ill. 2d 414, 424-25 (2002) (Freeman, J., dissenting). The best signal of legislative intent is the language used in the statute, which must be given its plain and ordinary meaning. *Gillespie Community Unit School District No. 7 v. Wight & Co.*, 2014 IL 115330, ¶ 31. Where the statutory language is clear and unambiguous, the court must give it effect without resort to other tools of interpretation. *Exelon Corp.*, 234 Ill. 2d at 275. It is never proper for a court to depart from the plain language by reading into the statute exceptions, limitations, or conditions that conflict with the clearly expressed legislative intent. *Id.*

¶ 31    The residency requirement of the Village's Municipal Code (Code) provided:

"Each and every officer and employee of the village, unless exempted by this chapter, must be a resident of the village as that term has been defined herein. Each and every officer must maintain resident status during his or her term of office. Each and every employee must maintain resident status during his or her period of employment." Village of Melrose Park Municipal Code § 2.52.020 (adopted 1997).

Furthermore, the Code provided, regarding police and fire personnel:

"Each and every patrol officer, police officer, and firefighter *** shall be a resident of the village as that term is defined in Section 2.52.010. Each and every patrol officer, police officer, and firefighter shall maintain resident status during his or her period of employment." Village of Melrose Park Municipal Code § 2.52.060(A) (adopted 1997).

Moreover:

"[a]ny individual hired *** to any position *** listed in subsections A and B of this section who fails to meet and/or comply with the residency requirements as set forth in this section shall thereafter be subject to discharge and/or termination from his or her employment by the board of police and fire commissioners of the village." Village of Melrose Park Municipal Code § 2.52.060(E) (adopted 1997).

¶ 32    The Code defined "residence" as "a dwelling place used as a home, located within the corporate boundaries of the village, and includes single-family dwellings, rental apartments and property, mobilehomes, condominiums, and dwelling units in multifamily, multidwelling or multipurpose buildings." Village of Melrose Park Municipal Code § 2.52.010 (adopted 1997).

A "resident" is defined as "a natural person who occupies a residence, as hereinbefore defined, as his or her principal place of residence and abode." *Id.*

¶ 33    To occupy generally means "to take or hold possession or control of" or "to reside in as an owner or tenant." Merriam-Webster's Collegiate Dictionary (10th ed. 1998). Principal generally means "most important, consequential, or influential: chief." *Id.* Giving the statutory language its plain and ordinary meaning, the Village's residency requirement clearly and unambiguously provided that Cannici had to live within the boundaries of the village in a home that was his primary or most important residence throughout his period of employment. Contrary to Cannici's argument on appeal, the record establishes that the Board did not erroneously construe the ordinance.

¶ 34    Furthermore, this court previously rejected Cannici's argument that, pursuant to *Maksym*, defendants bore the burden to show that Cannici intended to abandon his established status as a resident of the village. In *Cannici*, 2019 IL App (1st) 181422, ¶¶ 38-44, this court construed the same Code provision at issue. This court explained that the analysis in *Maksym* had considered, in the context of eligibility to hold office, whether the mayoral candidate had abandoned his established Chicago residency because the Illinois Municipal Code (65 ILCS 5/1-1-1 *et seq.* (West 2010)) did not clearly define resident or residency. *Cannici*, 2019 IL App (1st) 181422, ¶ 42. The Village's Code, however, "clearly defines resident and residence, and it requires its employees to maintain their status as residents during their employment." *Id.* ¶ 43. Here, consistent with our earlier analysis, "we find no reason to depart from the plain language by reading into the ordinance

definitions and tests drawn from other cases that conflict with the clearly expressed legislative intent." *Id.*

¶ 35    Cannici's reliance on *Thomas v. Chicago Transit Authority*, 2014 IL App (1st) 122402, is also unavailing because that case involved the concept of domicile as the criteria for residency. Here, in contrast, the issue of Cannici's residency is resolved according to the Village Code's clear definitions of resident and residency, which do not refer to domicile. The Village Code's residency requirement is not concerned with domicile or abandonment or intent to return.

¶ 36    We conclude that the Board properly interpreted the residency requirement of the Code.

¶ 37                    B. Intent to Maintain or Abandon Residency

¶ 38    Second, Cannici argues that the Board's decision to deny him unemployment benefits was clearly erroneous because (1) the Board applied the standard for *establishing* residency instead of the test for *abandoning* residency and (2) the evidence clearly established that Cannici intended to maintain his residency in the village. This argument is moot based on our analysis above, which concluded that the Board properly interpreted the plain language of the residency requirement of the Village's Code and the *Maksym* analysis of the Illinois Municipal Code concerning a resident's intent to abandon an established residency is not relevant here.

¶ 39                    C. Misconduct and Unemployment Benefits

¶ 40    Third, Cannici argues that the Board's decision to deny him unemployment benefits should be overturned because the evidence failed to establish the requisite facts that his misconduct (*i.e.*, his violation of the Village's residency ordinance) was willful and intentional and harmed his employer.

¶ 41    If an employer discharges an employee for misconduct connected with his work, the employee is not eligible for unemployment benefits under the Act. 820 ILCS 405/602(A) (West 2016). An individual who is discharged for misconduct is not eligible for benefits because the Act is intended to benefit those who become unemployed through no fault of their own. *Lojek v. Department of Employment Security*, 2013 IL App (1st) 120679, ¶ 34. Under the Act, an employee was discharged for misconduct if, as relevant here, (1) the employer had a reasonable work rule, (2) the employee deliberately and willfully violated the rule, and (3) the violation either was repeated by the employee despite a prior warning or harmed the employer. 820 ILCS 405/602(A) (West 2016); *Woods v. Illinois Department of Employment Security*, 2012 IL App (1st) 101639, ¶ 19. Here, Cannici concedes the first factor of this analysis but challenges the second and third factors.

¶ 42    The questions of whether Cannici lived in the Village and knew of the residency ordinance are questions of fact, reviewed under the "against the manifest weight of the evidence" standard. Those questions also turn on the Board's determination of Cannici's credibility. When the issue is one of fact, this court's review is highly deferential because it starts with the presumption that the Board's factual findings are "prima facie true and correct." 735 ILCS 5/3-110 (West 2016). This court will not disturb such a finding unless it is against the manifest weight of the evidence. *Woods*, 2012 IL App (1st) 101639, ¶ 16. A finding is against the manifest weight of the evidence only when the opposite conclusion is clearly evident. *Id.* And the opposite conclusion is not clearly evident as long as there is some evidence of record to support the finding. *Id.* Moreover, this court will not reevaluate the Board's credibility determinations, reweigh the evidence, or substitute its

judgment for that of the Board. *Chisem v. McCarthy*, 2014 IL App (1st) 132389, ¶ 21; *Woods*, 2012 IL App (1st) 101639, ¶ 16.

¶ 43    However, the ultimate issue of whether an employee was discharged for misconduct—by deliberately and willfully violating a reasonable work rule and harming his employer—presents a mixed question of fact and law, which we review under the clearly erroneous standard. *Petrovic*, 2016 IL 118562, ¶ 21; *Thomas*, 2014 IL App (1st) 122402, ¶ 39 (this standard applies when the facts are admitted or established, the controlling rule of law is undisputed, and the issue is whether the facts satisfy the legal standard); *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 211 (2008) (whether a given set of facts satisfies the applicable legal standard is a mixed question of law and fact, reviewed under the largely deferential clear error standard). A determination on a mixed question is clearly erroneous only if the court is left with a "definite and firm conviction that a mistake has been made." *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 234 Ill. 2d 446, 464 (2009).

¶ 44                              1. Deliberate and Willful Violation

¶ 45    Cannici argues the evidence showed that his misconduct was not willful and intentional because he testified that the Village never trained its employees or provided guidance on the meaning of the residency ordinance, never asked for reaffirmations of residency, and never provided questionnaires to determine if the employees understood the residency requirement. The first time the Village gave Cannici any notice of his alleged violation was in June 2016, when he learned that his residency was being investigated. At that time, he informed his tenants, who moved out, and he promptly returned to sleeping at the village house fulltime. Cannici argues that

he had no reason to believe that his conduct violated the ordinance because similar conduct by other Village employees did not seem to result in any detrimental action against them by their employer.

¶ 46    The Board's finding that Cannici resided in Orland Park was not against the manifest weight of the evidence because the undisputed evidence showed that, from June 2013 to June 2016, he occupied his house in Orland Park with his family as his principal residence and abode. During those three years, he never slept at the village house, which was occupied by tenants. Although Cannici stored some belongings there, paid the taxes and utilities, and continued to use it as his mailing address, there was no evidence that he actually did anything at his village house other than retrieve his mail from his tenants. He was not that house's resident, as defined in the Village's Code. He was its landlord.

¶ 47    The Board found that Cannici's argument that he did not deliberately and willfully violate the residency ordinance "strain[ed] credulity." A violation of a work rule is considered deliberate and willful when the employee was aware of the rule but disregarded it (*Sudzus*, 393 Ill. App. 3d at 826), and it is undisputed that Cannici was aware of the Village's residency requirement. The Board stated that Cannici's hasty compliance with the requirements of the residency ordinance was another indisputable fact and suggested that he was deliberately and willfully violating the residency ordinance. The Board found that he "carefully maintained indicia of his supposed residency in" the village in a "pathetic attempt to deceive and cover up a glaring and obvious fact: [f]or a period of 3 years [he] intentionally violated [the Village's] residency ordinance." The "requirement that a rule violation be 'deliberate and willful' necessarily requires evidence that

the employee was aware that [his] conduct was prohibited." *Petrovic*, 2016 IL 118562, ¶ 31. Here, that evidence was Cannici's maintenance of the fiction that he lived in the village while continually living in Orland Park with his family for three years and then promptly returning to the Village when he was caught, *i.e.*, notified of the investigation. There is no dispute that Cannici's conduct was a series of conscious choices regarding where he resided at a particular time. *Cf. Wrobel v. Department of Employment Security*, 344 Ill. App. 3d 533, 538 (2003) (oversleeping was not conscious act). On administrative review, this court will not reweigh the evidence or substitute its judgment for that of the Board. *Chisem*, 2014 IL App (1st) 132389, ¶ 21.

¶ 48     Cannici states that the Village did not present any witness to contradict any of his testimony and asserts that everything that he said was true. However, the Board, as the fact finder, was permitted to disbelieve testimony that was contradicted by the circumstances or inherently improbable. See *Crabtree v. Illinois Department of Agriculture*, 128 Ill. 2d 510, 518 (1989). The Board disbelieved Cannici's testimony that he did not understand that he was violating the residency ordinance, and the court cannot reevaluate that credibility determination on administrative review. See *Chisem*, 2014 IL App (1st) 132389, ¶ 21.

¶ 49     Cannici also states that he was never disciplined for any infraction prior to his termination. This argument goes to the weight of the evidence, so it cannot be a basis for overturning the Board's findings. See *id.* It does not render the Board's finding that Cannici knew his conduct violated the Village's ordinance clearly erroneous or against the manifest weight of the evidence. See *Kappel v. Police Board of the City of Chicago*, 220 Ill. App. 3d 580, 596 (1991) ("The Board

- 16 -

is not required to suspend, rather than discharge, an officer solely because he has provided numerous years of good service ***.").

¶ 50   Cannici testified that he knew about other employees violating the residency ordinance and argues that this knowledge supports his subjective belief that he was not violating the residency ordinance. But Cannici's testimony simply could have shown that he believed other employees were getting away with violating the ordinance and that he could too. The Board found that Cannici knew that he was violating the residency requirement, and we do not reweigh the evidence on administrative review. *Chisem*, 2014 IL App (1st) 132389, ¶ 21. Even if there had been evidence of selective enforcement, that cannot excuse employee behavior where there is a finding that the employee violated employment rules; cause for discharge can be found regardless of whether other employees have been disciplined differently, and this court has declined to compare the discipline imposed in separate cases where the cases involved do not comprise identical circumstances. *McDermott v. City of Chicago Police Board*, 2016 IL App (1st) 151979, ¶¶ 25-26.

¶ 51   We conclude that the Board's determination that Cannici deliberately and willfully violated the residency ordinance was not clearly erroneous.

¶ 52                                    2. Violation Harmed Employer

¶ 53   Finally, Cannici argues that the Village failed to present any evidence that his conduct harmed his employer because no evidence showed that his residency had any negative effect on his coworkers or that they even knew where he slept at night.

¶ 54   The harm caused by an employee's rule violation need not be actual; it can be merely potential. *Hurst v. Department of Employment Security*, 393 Ill. App. 3d 323, 329 (2009). Harm

includes "damage or injury to other employees' well-being or morale or to the employer's ***
operations or goodwill" and "damage or injury that could be reasonably foreseen to occur but for
the individual being prevented from *** continuing to work." 56 Ill. Adm. Code 2840.25(b), (c)
(2019). Here, the Board stated that employers are always harmed when their employees flout their
rules because such conduct undermines the employers' authority and creates confusion and morale
problems among the offending employees' coworkers. This finding was supported by the evidence
that Cannici lived in Orland Park while deliberately maintaining the ruse that he lived in the
Village.

¶ 55    In *Hurst*, an employee's failure to report a drunk driving arrest harmed the employer
because, among other reasons, it was "insubordinate behavior that was harmful to [the employer's]
interest in maintaining an orderly workplace." 393 Ill. App. 3d at 329. In *Phistry v. Department of
Employment Security*, 405 Ill. App. 3d 604, 608 (2010), an employee's improper use of a business
credit card harmed the employer not only financially but also "by the loss of trust that had been
placed in her by the employer." These are the same harms that the Board identified here:
undermining the employer's authority and creating confusion and morale problems.

¶ 56    Cannici relies on *Kiefer v. Department of Employment Security*, 266 Ill. App. 3d 1057
(1994), to support his argument that the Village must show evidence of actual harm. In *Kiefer*, the
court held that an employee did not harm her employer when she used its name without
authorization on an insurance quote request form on behalf of a different company because (1) the
employee's act "was clearly a one-time occurrence," (2) the form was "merely an information-
gathering tool," and (3) her employer authorized and directly received the compensation for her

work on behalf of the other company. *Id.* at 1058-62. The potential harms claimed by the employer—liability, monetary sanctions for allegedly violating state law, and loss of goodwill—were either nonexistent or "nothing more than a remote possibility." *Id.* at 1062. Here, in contrast, Cannici's conduct was not a one-time occurrence. Rather, he deliberately and continuously disregarded the residency ordinance for three years. Also, *Kiefer* did not address the harms of confusion and undermining of authority and morale identified in *Hurst* and *Phistry* and by the Board in this case. See *id.*

¶ 57    Furthermore, although *Kiefer*, in 1994, stated, "a few courts have held that a threat of future financial loss" could constitute harm under the Act (*id.*), in 2009, *Hurst* cited six cases to show that "[t]he weight of authority recognizes that harm to the employer can be established by potential harm and is not limited just to actual harm." 393 Ill. App. 3d at 329; see, *e.g.*, *Manning v. Department of Employment Security*, 365 Ill. App. 3d 553, 558 (2006) (hostile and intimidating language had potential to affect employee morale and cooperation); accord *Wise v. Department of Employment Security*, 2015 IL App (5th) 130306, ¶ 18; *Farris v. Department of Employment Security*, 2014 IL App (4th) 130391, ¶ 38.

¶ 58    Cannici argues that there was no evidence that anyone else knew about his conduct. But this does not show a lack of harm. As discussed, Cannici's violation of the residency ordinance was insubordinate and potentially harmful to the Village's interests. See *Greenlaw v. Department of Employment Security*, 299 Ill. App. 3d 446, 449 (1998) (employee's abusive words in front of two supervisors was insubordinate and potentially harmful to employer), *overruled on other grounds by Petrovic*, 2016 IL 118562, ¶¶ 35-36; 56 Ill. Adm. Code 2840.25(b), (c) (2019)

(examples of harm include employee secretly stealing trade secrets even if they are never divulged, and employee who is required to have valid driver's license and fails to disclose that his license is suspended). We conclude that the Board's determination that Cannici's violation of the residency ordinance harmed his employer was not clearly erroneous.

¶ 59    The Board found that Cannici intentionally violated the residency ordinance and determined that he harmed the Village. Because these rulings are supported by evidence in the record, they are not against the manifest weight of the evidence. Furthermore, applying the clearly erroneous standard of review, we conclude that the evidence in the record supports the Board's determination that Cannici was discharged for misconduct within the meaning of section 602(A) of the Act. Accordingly, we conclude that the Board's decision to deny Cannici unemployment benefits was not clearly erroneous.

¶ 60                                        III. CONCLUSION

¶ 61    For the foregoing reasons, we affirm the judgment of the circuit court that affirmed the Board's decision to deny Cannici unemployment benefits.

¶ 62    Affirmed.

---

**No. 1-18-1562**

---

| | |
|---|---|
| **Cite as:** | *Cannici v. Illinois Department of Employment Security Board of Review*, 2021 IL App (1st) 181562 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CH-2884; the Hon. Ann Collins-Dole, Judge, presiding. |
| **Attorneys for Appellant:** | Ruth I. Major, of Law Offices of Ruth I. Major, P.C., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Joseph M. Gagliardo and Jeffrey S. Fowler, of Laner Muchin, Ltd., of Chicago, for appellee Village of Melrose Park.<br><br>Kwame Raoul, Attorney General, of Chicago (David L. Franklin, Solicitor General, and Caleb Rush, Assistant Attorney General, of counsel), for other appellees. |