# Illinois Official Reports

## Appellate Court

---

### *Chisem v. McCarthy*, 2014 IL App (1st) 132389

---

| | |
|---|---|
| Appellate Court Caption | JAMIE CHISEM, Plaintiff-Appellant, v. GARRY M. McCARTHY, Superintendent of Police of the Chicago Police Department, and THE POLICE BOARD OF THE CITY OF CHICAGO, Defendants-Appellees. |
| District & No. | First District, Third Division<br>Docket No. 1-13-2389 |
| Filed | December 23, 2014 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CH-21729; the Hon. Thomas R. Allen, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Colleen R. Daly, of Colleen R. Daly Attorney at Law, LLC, of Chicago, for appellant.<br><br>Stephen R. Patton, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Sara K. Hornstra, Assistant Corporation Counsel, of counsel), for appellees. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.

Presiding Justice Pucinski and Justice Mason concurred in the judgment and opinion.

**OPINION**

¶ 1   Plaintiff Jamie Chisem appeals from an order of the circuit court of Cook County affirming his five-year suspension from the Chicago police department (CPD) imposed by defendant the Police Board of the City of Chicago (Board). On appeal, plaintiff contends that defendant Garry M. McCarthy, the superintendent of the CPD, and the Independent Police Review Authority (IPRA) filed untimely charges in violation of plaintiff's right to due process, the City of Chicago's municipal code (City's Code), Chicago Police Department General Order 93-03 (eff. Apr. 15, 2011), and the doctrine of *laches*. In addition, plaintiff contends that his five-year suspension was against the manifest weight of the evidence. We affirm.

¶ 2                                BACKGROUND

¶ 3   On February 25, 2009, an incident occurred involving a possible curfew violation at a Chicago Walgreens located at 3405 South King Drive, between plaintiff, a CPD officer since 2003, and twin sisters Ashley and Tiffany Magby. Immediately following the encounter, the Magbys filed a formal complaint against plaintiff alleging unprofessional conduct. The IPRA conducted an investigation, and on December 2, 2011, the Superintendent filed charges alleging that plaintiff had violated five CPD Rules of Conduct (rules), including:

Rule 2: "Any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department."

Rule 6: "Disobedience of an order or directive, whether written or oral."

Rule 8: "Disrespect to or maltreatment of any person, while on or off duty."

Rule 9: "Engaging in any unjustified verbal or physical altercation with any person, while on or off duty."

Rule 14: "Making a false report, written or oral."

¶ 4   In March 2012, the Board held a three-day departmental hearing. Ashley Magby, an emergency room nurse, testified that at approximately 10 p.m. on the night of the incident, she and her twin sister Tiffany encountered plaintiff and another officer outside the entrance to the Walgreens. Plaintiff asked to see their identification (IDs) for a possible curfew violation. Being a 21-year-old woman at the time, Ashley told plaintiff that she was an adult and walked into the store. Plaintiff then approached the Magbys by the cosmetic section and asked again to see their IDs. Ashley complied and explained that her twin sister did not have any identification on her. Plaintiff commented that they looked significantly younger and returned Ashley's ID. Ashley told plaintiff that he was trying to take advantage of the situation and proceeded with Tiffany to the opposite end of the store to buy groceries. Plaintiff continued to follow the Magbys into the milk aisle and asked which one of them was the oldest. The Magbys just ignored plaintiff, selected their groceries, and walked toward the front of the store near the cashier where plaintiff's partner stood.

¶ 5   At this point, a physical altercation ensued. Plaintiff first approached Tiffany and asked her something about her headscarf. He then "grabbed [Ashley's] arms behind [her] back and

pushed her towards his partner, like in a position like he was going to arrest [her], and then like kind of got up close towards [her] back to the point where [she could] feel his stomach near [her]." Plaintiff then said something like "we got us one" directed at his partner, who just shook his head. Tiffany verbally tried to get plaintiff to let Ashley go and even nudged him. After plaintiff released her, Tiffany told plaintiff he was messing with them because he had nothing to do and he agreed. Ashley then told plaintiff that he messed with the wrong person and she was going to inform his superintendent. He arrogantly showed her his badge number and said something like "I was only joking with you." He left the store and the Magbys purchased their items at the register. Overall, Ashley felt humiliated. She believed police officers were supposed to serve and protect, not take advantage of their authority. As soon as she got home, she immediately called to make a police report and a sergeant came out to document the occurrence.

¶ 6    Tiffany Magby, an associate producer on the Judge Mathis show, substantially corroborated Ashley's testimony. She also testified that when plaintiff asked about her headscarf he reached toward the top of her head to touch it. She instinctively moved back and told him it made her uncomfortable, but plaintiff simply laughed.

¶ 7    Debra King, a photo specialist at Walgreens, worked the cashier on the night of the incident. Plaintiff's partner was a regular customer, but she did not recognize plaintiff. She first noticed the Magbys arguing with plaintiff as they approached the register. She heard them say they were going to report plaintiff because he was harassing them even after he saw an ID. He kept saying "are you serious" and apologized. The conversation lasted a few minutes and the Magbys appeared upset.

¶ 8    On cross-examination, King testified that she did know the Magbys' age, but they arguably looked younger. No store patrons complained about an officer acting inappropriately. She also did not see plaintiff make physical contact with the Magbys or hear plaintiff verbally remark to his partner. She did not recognize plaintiff at the time of the incident, but did encounter him a year prior when he gave her a traffic citation for driving without a headlight. She recalled him being professional. Prior to the Magbys' arrival, however, she noticed plaintiff watching a teenage girl in a White Castle uniform. When the teenager went to exit, he inappropriately patted her down and followed her out. On redirect examination, she did admit that plaintiff did not pat the teenager under her clothing, and although she complained about this incident to a Walgreens security guard, she did not make a formal complaint to the CPD.

¶ 9    On adverse examination, plaintiff testified that he questioned the Magbys at the Walgreens for a possible curfew violation. One of the Magbys showed him her identification, and after he established that there was no violation, he tried to talk to the Magbys. He did not follow them around the store, try to flirt with them, touch one twin's headscarf, or pull one twin's hands behind her back and push her toward his partner. One of the Magbys did say that she was going to report his conduct.

¶ 10    Several character witnesses briefly testified on plaintiff's behalf, attesting to his professionalism, work ethic, and innate ability to defuse hostile situations. Plaintiff then retook the stand on his own behalf and testified that he arrived at the Walgreens around 10 p.m. and saw the Magbys, who appeared to look like young teenagers. Plaintiff asked them several times for identification while in the candy aisle and one of the twins gave him her ID. He recalled the Magbys being smart, sarcastic and uncooperative. He gave them the benefit of the doubt that they were twins because he did not think they looked alike. The twin who did not

give her ID tried to walk away and he may have grabbed her arms. He made contact with her because he wanted to maintain the situation and continue his investigation. He explained to the Magbys that citizens cannot walk away from police, but they did not seem to care. Plaintiff did not follow the Magbys after this incident, but did recall having a brief conversation with them around the checkout counter. He recalled the Magbys being upset and was thus apologetic. He gave his badge number to one of the twins because it was customary. Overall, he believed he was professional and did his job. He also did not inappropriately pat down a teenager in a White Castle uniform and was not even in the Walgreens 20 minutes prior to the Magbys' arrival.

¶ 11    On April 19, 2012, the Board concluded that plaintiff violated all five rules and discharged him from the CPD "due to the serious nature of his conduct." Specifically, the Board determined that plaintiff engaged in unnecessary and inappropriate physical contact with the Magbys, detained them in violation of CPD policy, failed to document the encounter, and made material false official statements to the IPRA in an attempt to cover up his misconduct. The Board also denied plaintiff's prehearing motion to dismiss the case based on the IPRA and superintendent's failure to file charges in a timely manner. The court concluded that the case was not barred by the doctrine of *laches* and plaintiff failed to show a violation of his right to due process.

¶ 12    Subsequently, plaintiff filed for administrative review. In his complaint, plaintiff contended that the case should be dismissed based on the lapse of time between the incident and the filing of charges, and that the Board's determination was against the manifest weight of the evidence. On January 17, 2013, the circuit court reversed the discharge decision and remanded for an alternative sanction. After review, the Board suspended plaintiff for five years while noting that it believed discharge was the appropriate sanction. In response, plaintiff challenged the suspension by filing a motion for further proceedings and judicial review, in which he argued that the five-year suspension was against the manifest weigh of the evidence and served as a *de facto* discharge. The trial court disagreed and affirmed the five-year suspension.

¶ 13                                                    ANALYSIS
¶ 14    Plaintiff initially contends that the superintendant and IPRA filed untimely charges in violation of plaintiff's right to due process, the City's Code and CPD General Order 93-03. The due process clause protects fundamental fairness and justice. *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 272 (2004). Procedural due process claims question the constitutionality of the procedures used to deny a person of life, liberty or property. *Id.* While the core of due process is the right to notice and a meaningful opportunity to be heard, it is a flexible concept and requires only such procedural protections as fundamental principles of justice and the particular situation demand. *Callahan v. Sledge*, 2012 IL App (4th) 110819, ¶ 27. It is a well-established constitutional principle that every citizen has the right to pursue a trade, occupation, business or profession. *Morgan v. Department of Financial & Professional Regulation*, 374 Ill. App. 3d 275, 300 (2007). Whether a party's constitutional rights have been violated is reviewed *de novo*. *Hayashi v. Illinois Department of Financial & Professional Regulation*, 2014 IL 116023, ¶ 22.

¶ 15    In the case *sub judice*, plaintiff's right to due process was not violated. We first note that plaintiff's reliance on *Morgan* and *Lyon* is misplaced. *Morgan* and *Lyon* both involved a delay

in the adjudication of allegations of misconduct after the respective plaintiffs had been suspended from employment, not a delay in the investigation leading to an initial suspension. See *Morgan*, 374 Ill. App. 3d at 303 (where this appellate court determined that the State violated a clinical psychologist's right to due process when the State took 15 months to decide the case after the issuance of suspension); *Lyon*, 209 Ill. 2d at 282 (where the supreme court determined that the director of the Department for Children and Family Services (DCFS) failed to abide by specific regulatory time limits for decision-making after a teacher was suspended for allegedly abusing his students). While we agree that plaintiff does have a property interest in his employment, plaintiff was working as a paid CPD officer throughout the entire investigation and was only suspended after charges were officially filed. In addition, he was immediately given notice of the pending investigation and a meaningful opportunity to be heard. Accordingly, there was no violation of plaintiff's right to due process in this particular situation.

¶ 16   The record before us also suggests that the IPRA did substantially comply with the City's Code. The City's Code requires:

"If the chief administrator does not conclude an investigation within six months after its initiation, the chief administrator shall notify the mayor's office, the city council committee on public safety, the complainant, and the employee named in the complaint or his or her counsel of the general nature of the complaint or information giving rise to the investigation and the reasons for failure to complete the investigation within six months." Chicago Municipal Code § 2-57-070 (added July 19, 2007).

Here, the IPRA notified plaintiff in a letter approximately six months after the investigation began that it was still ongoing because witness cooperation was needed. Nothing in the specific ordinance requires continued notification on the IPRA's part as plaintiff suggests or that failure to strictly comply results in the automatic dismissal of a complainant's case. See *City of Marengo v. Pollack*, 335 Ill. App. 3d 981, 986 (2002) (municipal ordinances are interpreted under the rules of statutory construction and the best evidence of the drafter's intent is the language of the ordinance, which must be given its plain and ordinary meaning). Plaintiff cites no authority to support either of these contentions as required by Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013), and we will not consider this matter further. See *Bartlow v. Costigan*, 2014 IL 115152, ¶ 52 (it is well settled that a reviewing court is entitled to clearly defined issues and citations to pertinent authority).

¶ 17   We also observe no direct violation of General Order 93-03, which requires a prompt and thorough investigation. Although the investigation took a substantial amount of time, this directive does not set an absolute deadline within which investigations must be completed, but provides that if the investigation lasts more than 30 days, the investigator must seek and obtain an extension of time within which to complete the investigation. See Chicago Police Department General Order 93-03 (eff. Apr. 15, 2011). The IPRA regularly sought and was granted extensions of time to complete its investigation. Once completed, CPD directives required the matter to be further reviewed at several levels. And even if a violation occurred, nothing in the directive suggests, and plaintiff provides no support for, the presumption that automatic dismissal is the sanction. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013). Thus, there was no due process violation.

¶ 18   In the alternative, plaintiff contends that his charges are barred by the doctrine of *laches*. On the merits, *laches* is an equitable doctrine that precludes the assertion of a claim by a

litigant whose unreasonable delay in raising that claim has prejudiced the opposing party. *City of Chicago v. Alessia*, 348 Ill. App. 3d 218, 228 (2004). The doctrine is grounded in the equitable notion that courts are reluctant to aid a party who has knowingly slept on his rights to the detriment of the opposing party. *Id.* Two elements are necessary to find *laches*: (1) lack of diligence by the party asserting the claim; and (2) prejudice to the opposing party resulting from the delay. *In re Sharena H.*, 366 Ill. App. 3d 405, 413 (2006). A mere lapse in time from the accrual of a cause of action to the filing of a lawsuit is insufficient to support a *laches* defense. *Madigan ex rel. Department of Healthcare & Family Services v. Yballe*, 397 Ill. App. 3d 481, 493 (2009). Moreover, as a general rule, the doctrine of *laches* does not apply to governmental entities absent extraordinary circumstances because *laches* could impair the functioning of the government, which, in turn, would adversely affect the public. *Id.* at 493-94. The decision with respect to whether *laches* should be invoked is generally a discretionary matter. *Van Milligan v. Board of Fire & Police Commissioners*, 158 Ill. 2d 85, 91 (1994). We will not disturb the Board's determination "unless that determination is so clearly wrong as to constitute an abuse of discretion." (Internal quotation marks omitted.) *Lozman v. Putnam*, 379 Ill. App. 3d 807, 822 (2008).

¶ 19    In the instant case, plaintiff fails to establish prejudice resulting from the delay in filing. We have already discussed above that plaintiff was not prejudiced by losing his employment because he was gainfully employed until charges were filed and was only denied employment after a fair hearing. Plaintiff's blanket statement that he was prejudiced by his inability to find counterevidence does not alone constitute an extraordinary circumstance. The record does not demonstrate that any material witness was unavailable to testify or that the Magbys had trouble with their overall recollection of events. See *Bultas v. Board of Fire & Police Commissioners*, 171 Ill. App. 3d 189, 195 (1988) (the court concluded that the plaintiff was not prejudiced by the filing delay when the plaintiff presented only evidence of conflicting testimony without any evidence of witnesses testifying doubtfully or material witnesses being unavailable to testify); *cf. Mank v. Board of Fire & Police Commissioners*, 7 Ill. App. 3d 478, 485 (1972) (the court found the delay prejudiced the plaintiff when several witnesses were not available to testify). Therefore, we cannot say that the Board abused its discretion in concluding that no extraordinary circumstances existed to warrant triggering the invocation of *laches*. See *Van Milligan*, 158 Ill. 2d at 91 (where the supreme court did not find a valid basis to disturb the discretionary determination of the police board when the plaintiff failed to establish prejudice by the approximate five-year delay in filing disciplinary charges against him).

¶ 20    Plaintiff further contends that the trial court erred in affirming his five-year suspension because it was against the manifest weight of the evidence based on major inconsistencies in trial testimony and his reputation as a decorated officer. In an appeal from the judgment of an administrative review proceeding, this court reviews the decision of the administrative agency and not the decision of the circuit court. *Krocka v. Police Board*, 327 Ill. App. 3d 36, 46 (2001). The scope of review of an administrative agency's decision regarding discharge requires a two-step analysis. *Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n*, 85 Ill. 2d 547, 550 (1981). First, the court must determine whether the administrative agency's findings of fact are against the manifest weight of the evidence. *Id.* Second, the court must determine if the findings of fact provide a sufficient basis for the Board's conclusion that cause for discharge exists. *Crowley v. Board of Education of the City of Chicago*, 2014 IL App (1st) 130727, ¶ 29. Because the Board is in the best position to

determine the effect of an officer's conduct on the operations of the department, its determination of cause is given considerable deference. *Robbins v. Department of State Police Merit Board*, 2014 IL App (4th) 130041, ¶ 39. Thus, we may not consider whether we would have imposed a more lenient sentence. *Krocka*, 327 Ill. App. 3d at 48. Accordingly, the Board's decision is to be overturned only if it is arbitrary and unreasonable, or unrelated to the requirements of the service. *Siwek v. Police Board*, 374 Ill. App. 3d 735, 738 (2007).

¶ 21 Based on our review of the record, we cannot say that the Board's findings were unreasonable. Testimony supported the Board's determination that plaintiff engaged in unnecessary and inappropriate physical contact with the Magbys when plaintiff unjustifiably restrained Ashley as if to arrest her and proceeded to touch Tiffany's headscarf. Plaintiff himself admitted he may have grabbed one of the Magbys' arms. It was also undisputed that plaintiff followed and detained the Magbys longer than was required to determine if there was probable cause to arrest. Plaintiff further failed to document the encounter, complete a "Contact Information Card," and made a false official statement to the IPRA. In addition, plaintiff and King corroborated the Magbys' testimony that they became upset after the encounter, that they informed plaintiff of their intention to report him, and that plaintiff apologized. While we agree with plaintiff that there is conflicting testimony in terms of his version of events and the Magbys, plaintiff is in fact asking us to reweigh the evidence and make credibility determinations, which we will not do upon our review. See *Edwards v. Addison Fire Protection District Firefighters' Pension Fund*, 2013 IL App (2d) 121262, ¶ 34 (the board, as the finder of fact, makes credibility determinations and assigns weight to testimony and other evidence; we do not weigh the evidence or substitute our judgment for that of the board).

¶ 22 Furthermore, the record does not substantiate that King held any bias toward plaintiff for issuing her a prior traffic violation. King initially did not even recognize plaintiff, testified that plaintiff behaved professionally, and paid no fines. We also find plaintiff's contention that he should have been allowed to introduce a surveillance video into evidence to rebut King's testimony that she witnessed plaintiff inappropriately search a teenage girl immaterial. Even if the surveillance video verified plaintiff's contention and King was mistaken about the identity of the officer, the Board still had ample evidence as discussed above to find that plaintiff violated five rules. Accordingly, we cannot conclude that the Board's findings of fact were against the manifest weight of the evidence.

¶ 23 We next consider whether the findings of fact provide a sufficient basis for the Board's conclusion that cause for a suspension exists. "Cause" has been defined as "some substantial shortcoming which renders [the employee's] continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for his [discharge]." (Internal quotation marks omitted.) *Launius v. Board of Fire & Police Commissioners*, 151 Ill. 2d 419, 435 (1992). Illinois courts have recognized that "police departments, as paramilitary organizations, require disciplined officers to function effectively and have accordingly held that the promotion of discipline through sanctions for disobedience of rules, regulations and orders is neither inappropriate nor unrelated to the needs of a police force." *Siwek*, 374 Ill. App. 3d at 738. Consequently, even an officer's violation of a single rule has long been held to be a sufficient basis for termination. *Kinter v. Board of Fire & Police Commissioners*, 194 Ill. App. 3d 126, 134 (1990).

¶ 24    Here, competent evidence supported the Board's finding that sufficient cause to issue plaintiff a five-year suspension existed because plaintiff's conduct was unprofessional and unbecoming of a CPD officer. As discussed above, plaintiff engaged in unnecessary and inappropriate physical contact with two young women and unlawfully detained them. He also failed to document the encounter and made a false official statement. There is no question that such disregard of the rules is detrimental to the discipline and efficiency of the CPD. See *Krocka*, 327 Ill. App. 3d at 48-49 ("[i]t is apparent that a police officer who does not abide by the laws that he has a duty to enforce will impair the discipline and efficiency of the police force" (internal quotation marks omitted)). Plaintiff's overall conduct also directly related to his service as a CPD officer. Even Ashley testified that she believed police officers were supposed to serve and protect, not intimidate and take advantage of their authority. See *Remus v. Sheahan*, 387 Ill. App. 3d 899, 904 (2009) (a law-enforcement officer is in a unique position of public trust and responsibility, thus he must at all times exercise sound judgment and uphold his responsibilities to the public and the department). Therefore, it was not unreasonable for the Board to find that a five-year suspension was warranted to deter similar acts of misconduct and protect the CPD's morale with the public. See *Kappel v. Police Board*, 220 Ill. App. 3d 580, 594 (1991) (it is important to effectively deter similar acts of misconduct by other officers to maintain the public's confidence in the department).

¶ 25    We also reject plaintiff's contention that a five-year suspension was too harsh. It is only our purview to consider whether the Board's punishment was unreasonable given the circumstances, not whether we would have imposed a more lenient sentence. See *id.* at 590 (it is the Board, rather than the court, which is best able to determine the effect of the officer's conduct on the proper operation of the department and issue an appropriate sanction). Plaintiff's reliance on cases where the Board issued a lighter suspension is misplaced, as this argument is only persuasive where an agency has given different treatment to two respondents in identical situations. See *Launius*, 151 Ill. 2d at 441-42 (the fact that different individuals had been disciplined disparately was not a basis for concluding that the board's disciplinary decision was unreasonable; such conclusions were only appropriate when individuals received different discipline in a single, identical, "completely related" case); *cf. Washington v. Civil Service Comm'n*, 98 Ill. App. 3d 49, 57 (1981) (where the reviewing court found the 29-day suspension unduly harsh when the plaintiff was accused of allegedly propositioning a female civilian for sex in exchange for leniency); *Keen v. Police Board*, 73 Ill. App. 3d 65, 74 (1979) (where the reviewing court affirmed the Board's one-year suspension when the plaintiff allegedly made unwanted sexual advances toward a female civilian). The record also substantiates that the Board fully complied with the circuit court's order on remand and plaintiff's suspension did not serve as a *de facto* discharge as he can return to active duty in the future. Consequently, based on the record as a whole, we cannot say that the Board's decision to issue plaintiff a five-year suspension was arbitrary, unreasonable, or unrelated to the requirements of service.

¶ 26                                          CONCLUSION

¶ 27    Based on the foregoing, we affirm the decision of the Board.

¶ 28    Affirmed.