2020 IL App (1st) 191532-U

FIRST DIVISION
September 30, 2020

No. 1-19-1532

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| TOCCARRA WILSON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | Appeal from the |
| | ) | Circuit Court of |
| v. | ) | Cook County |
| | ) | |
| THOMAS J. DART, Sheriff of Cook County, and THE | ) | No. 15 CH 4000 |
| COOK COUNTY SHERIFF'S MERIT BOARD, | ) | |
| | ) | The Honorable |
| Defendants | ) | Raymond W. Mitchell, |
| | ) | Judge Presiding. |
| (Thomas J. Dart, Sheriff of Cook County, Defendant- | ) | |
| Appellee). | ) | |

JUSTICE PIERCE delivered the judgment of the court.
Justices Griffin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The merit board's final administrative decision terminating plaintiff from her employment as a correctional officer wass not against the manifest weight of the evidence, and the circuit court's judgment affirming the merit board's decision is affirmed.

¶ 2    Defendant, the Cook County Sheriff's Merit Board (Board), terminated plaintiff, Toccarra

Wilson, from her position as a correctional officer following an administrative hearing. Wilson

sought administrative review in the circuit court, which affirmed the Board's decision. Wilson

appeals, arguing that the Board's decision was against the manifest weight of the evidence, the doctrine of *laches* should have been applied to bar the sheriff's complaint, and, alternatively, her termination was not for just and sufficient cause. For the following reasons, we affirm.

¶ 3                                          I. BACKGROUND

¶ 4      In April 2014, defendant, Thomas J. Dart, Sheriff of Cook County, filed a complaint against Wilson with the Board and made the following allegations. In July 2011, Wilson was a correctional officer with the Cook County Department of Corrections (CCDOC) assigned to the trust department, which handles the personal property of detainees in Cook County jail. Wilson violated CCDOC policies governing detainee trust accounts when she generated two intake property receipts for a detainee, Kashawn Williams,[1] with different amounts of currency (#338701 for $69, and #338704 for $39), and when she produced a cash summary report reflecting the intake receipt with the lesser amount of currency. Kashawn purportedly signed both receipts. Kashawn filed a grievance in September 2011 alleging that he had $69 in cash when his property was inventoried but his trust account was only credited with $39. Wilson told investigators from the Office of Professional Review (OPR) that the discrepancy was a result of a mistake on her part, she was not required to show a voided receipt, and Kashawn signed the property receipt for $39. The sheriff's complaint asserted that Wilson violated the sheriff's general orders regarding trust accounting procedures, her conduct was unbecoming, and she made a false report. The complaint sought Wilson's termination. In September 2014, the Board conducted a hearing, heard testimony from several witnesses, and admitted numerous exhibits into evidence.

¶ 5      Erica Queen gave the following testimony. In July 2011, she was the lieutenant in the receiving department, which included the trust department. The trust department was staffed by

---

[1]To avoid confusion due to the similarity between the last names of plaintiff (Wilson) and Mr. Williams, we will refer to Mr. Williams as Kashawn.

sworn correctional officers (trust officers). As lieutenant, Queen was a supervisor of the trust officers. At the beginning of a trust officer's shift, they would get a cash box and would sign for bundles of premarked triplicate receipts to use during their shift. Trust officers would receive sealed bags of detainee property, along with any accompanying documentation, *i.e.*, a signed receipt, from the transportation department or from the criminal court buildings. The trust officers would sign for the sealed bags. Detainees would approach the trust officer's window and the officer would open the sealed bag containing the detainee's property, count out the currency, enter the amount in the CCDOC's IMAC computer system used to inventory property, and generate a receipt in triplicate. Both the trust officer and the detainee would sign the receipt. One copy of the receipt went into the inventory bag, one copy went to the detainee, and one copy went to the finance department. If a receipt needed to be voided, the trust officer needed to initial the receipt, notify a supervisor, and attach the voided receipt to the cash summary report that would be turned over the trust department. Trust officers used cash summary reports "to tally up their banks at the end of the night," and a supervisor would verify and sign the report. Each night, Queen would "verify the bank," sign the appropriate paperwork, and ensure that all currency was sealed in a bag and placed in a locked safe.

¶ 6    In September 2011, Queen's superintendent asked her to investigate a grievance filed by Kashawn. Queen contacted the finance department and was informed that $39 was placed in Kashawn's trust account. The finance department provided her with the copy of the receipt it received, #338704 for $39. Queen checked Kashawn's property bag, which contained a Chicago police department receipt reflecting $69, as well as receipt #338701 signed by Wilson and Kashawn reflecting $69. She also reviewed the cash summary report created by Wilson on July 18, 2011, which did not reflect any voided receipts. She was unable to find an IMAC record for

Kashawn's property. Queen testified that July 18, 2011, Wilson voided a receipt for a different detainee that was properly recorded in IMAC and was properly documented. In September 2011, Queen created an incident report regarding the $30 discrepancy "[b]ecause it was unusual to have the [police department] receipt and a pink receipt in the property bag that didn't match what was submitted to the [f]inance [d]epartment." Queen complained about Wilson to OPR. Queen recommended in September 2011 that Wilson be transferred, and the transfer was approved on September 29, 2011.

¶ 7     On cross-examination, Queen testified that she had no knowledge of what happened to cause the $30 discrepancy and did not know which sergeant was on duty on July 18, 2011. She acknowledged that mistakes happen in the trust department and that sometimes the IMAC system would glitch. If there was a mistake on a receipt, the trust officer would consult with a supervisor who would then direct the trust officer to generate a voided receipt. It was not uncommon for a trust officer to create more than one cash summary report for a shift. The sheriff's general orders did not contain a procedure for dealing with mistakes. She could not identify the supervisor's signature on Wilson's cash summary report for July 18, 2011, relative to Kashawn's $39 receipt. She acknowledged that she did not speak with Wilson as part of her investigation, she only interviewed one person in the finance department during her investigation, and she did not speak to OPR during its investigation or give an interview.

¶ 8     On redirect, Queen testified that the sheriff's general orders provided that "[a]ll receipt numbers shall be accounted for with copies of voided receipts attached." Trust officers were not allowed to make corrections to receipts if a mistake was made.

¶ 9     Daniel Cramer testified that he was a former FBI clinical scientist with experience in comparison sciences, including handwriting comparisons. In 2013, an OPR director assigned him

4

to lead the OPR investigation of Queen's complaint against Wilson, which he concluded in December 2013. He reviewed (1) the Chicago police department receipt showing that Kashawn was arrested carrying $69; (2) the receipts created by Wilson for Kashawn reflecting $69 and $39; (3) Wilson's cash summary report for July 18, 2011; (4) the cash summary and IMAC reports for all the other detainees Wilson processed; (5) Kashawn's grievance; and (6) Queen's complaint to OPR. Kashawn's signature on the $39 receipt did not match his signature on the $69 receipt or his September 2011 grievance.

¶ 10    Cramer interviewed Wilson in June 2013. A memorandum of that interview, signed by Wilson, was admitted into evidence. During the interview, Wilson stated that she had not voided any receipts on the night of July 18, 2011. There was a discrepancy between the $69 and $39 receipts because she made a mistake while inventorying Kashawn's property and made a correction with the second receipt for $39. Wilson also stated that making mistakes was typical, there were no forms to fill out, there was no way to void a receipt, and officers would just fill out a new receipt if there was an error. Kramer reviewed receipts #338701 and #338704 and confirmed in his interview with Wilson that her signature appeared on both receipts. The signature on Kashawn's grievance was consistent with the signature on receipt #338701 for $69 but was not consistent with his signature on receipt #338704 for $39. Wilson explained to Cramer that she would generate a cash summary report with only one receipt if the inmate had come in late during shift and the cash drawer was already cashed out. Kashawn was allegedly processed through the CCDOC around 3:00 p.m. or 4:00 p.m. Wilson stated in the interview that she received a text message the day after the incident in July 2011 informing her that she had been transferred, but Cramer reviewed personnel records and learned that Wilson was transferred in September 2011. Wilson told Cramer that she spoke with Queen on the day of the incident in July 2011, but Queen

did not indicate that she would file a complaint. Wilson said that it was common for incoming property receipts to be incorrect. Wilson said that she put the $39 receipt with Kashawn's property, but Cramer later learned that the $39 receipt never made it into Kashawn's property bag. Cramer believed that Wilson made false statements during his interview regarding when she was transferred out of the trust department and amount of money Kashawn had, and she falsely stated that there was no way to void a receipt. Cramer testified that Wilson made false statements during her interview and in the signed written memorandum containing her statements, that she lied to OPR, and that she falsely stated that specific serialized receipts were not assigned to correctional officers. Cramer was not able to interview Kashawn as part of his investigation because he could not locate him.

¶ 11    On cross-examination, Cramer acknowledged that he did not investigate who Wilson's supervisor was on July 18, 2011. After Cramer filed his written report, he was able to interview Kashawn, but did not ask him to verify his signatures on the receipts.[2] The memorandum of his interview with Wilson was not a verbatim transcript. He did not have the ability to order Wilson to sign the statement. Wilson stated that she did not know which detainee's property she would be checking in to inventory, but Cramer concluded that Wilson's statement was false because Queen indicated that trust officers were given batches of receipts and they did know which detainees they would be processing. The sheriff's general orders did not set forth the procedure for voiding receipts. Wilson's interview occurred more than two years after the incident and Cramer did not know why there was a delay.

¶ 12    Juanita Peterson testified that she was a sergeant in the trust department in July 2011 and was a supervisor. She was not Wilson's supervisor on July 18, 2011. Trust officers made mistakes

---

[2]Kashawn did not testify before the Board, and the Board sustained Wilson's objection to an attempt to elicit testimony as to what Kashawn told Cramer during Cramer's interview.

in the trust department multiple times. There were no policies for dealing with mistakes, and trust officers "were not given any basic way" to correct mistakes. Instead, "you feel your way through it" and "try to figure out what's going on and fix the problem." Trust officers did not know which inmates they would be processing on any given shift. She acknowledged that when officers made a mistake counting cash, they had to void the incorrect receipt. In her experience, there were no occasions where a trust officer made a mistake and did not need to fill out a voided receipt, and there were no occasions where a trust officer made a mistake and she learned that a voided receipt had not been filled out.

¶ 13    Wilson gave the following testimony. She had no accounting or banking experience when she was assigned to the trust department in 2010. She was not given any training prior to the assignment and learned how to do the job from her peers. She described the environment as chaotic, hectic, and stressful. She had no advance knowledge of which inmates she would be processing during any given shift. She made mistakes on more than one occasion and would tell her supervisor when she made a mistake. She could not recall who the supervisor was on July 18, 2011. There was no specific policy explaining how to correct mistakes and she would rely on a supervisor for direction if she made a mistake. She had no independent recollection of July 18, 2011. She did inform a supervisor that she had made a mistake with Kashawn's property and did not recall the supervisor telling her to complete a voided receipt. She would only void a receipt if she were told to do so by a supervisor. More than two years passed from July 18, 2011, to the time she was interviewed by OPR in 2013. During that time, she worked in three other capacities and could not recall all the details of how the trust department operated. She denied stealing any money from any detainees.

¶ 14    On March 5, 2015, the Board filed its written decision. The Board found Queen's and Cramer's testimony credible and found that Wilson's testimony was "not credible and not believable." The Board further found that (1) Wilson created two receipts for Kashawn, the first receipt for $69 and the second receipt for $39; (2) the $39 receipt was submitted to the finance department, which credited Kashawn's trust account for $39; and (3) Kashawn's property bag contained a Chicago police department receipt reflecting that Kashawn had $69 in cash when he was arrested. The Board did not believe Wilson's testimony that she was told by a supervisor not to void Kashawn's receipt because Wilson attached a voided receipt for a different detainee to a cash summary report for July 18, 2011. The Board concluded that Wilson violated (1) the sheriff's general order 2.3(II)(E) governing inmate trust fund accounting when she created the $39 receipt for Kashawn's property when he was not present, failed to place the $39 receipt in Kashawn's property bag, and failed to attach the $69 to her cash summary report as a voided receipt; (2) the sheriff's general order 4.1 governing internal investigations when she made a false report by creating two receipts for the same inmate on the same date; and (3) sheriff's order 11.2.20.0(II), (IV) setting forth rules of conduct because Wilson was untruthful during OPR's investigation. The Board ordered that Wilson be terminated from her employment with the sheriff's office effective April 18, 2014.

¶ 15    Wilson filed a timely complaint in the circuit court of Cook County seeking administrative review of the Board's final administrative decision.[3] Relevant to this appeal, Wilson argued that

_____

[3]The circuit court initially found that the Board's March 5, 2015, decision was void under this court's decisions in *Taylor v. Dart*, 2016 IL App (1st) 143684 and *Taylor v. Dart*, 2017 IL App (1st) 143684-B, and remanded the matter to the Board for a new hearing under a "legally constituted" Board. The circuit court, however, subsequently granted defendants' motion to reconsider in light of this court's decisions in *Cruz v. Dart*, 2019 IL App (1st) 170915 and *Lopez v. Dart*, 2018 IL App (1st) 170733, applying the *de facto* officer doctrine. The circuit court vacated its order finding the Board's decision void and remanding the matter for new hearing and addressed Wilson's complaint on the merits. On appeal, Wilson

(1) the Board's findings were against the manifest weight of the evidence, (2) the Board should have applied the doctrine of *laches* based on how long the Department's investigation took, and (3) dismissal was too harsh of a penalty. After briefing and hearing argument, the circuit court entered a writing order affirming the Board's decision. Wilson filed a timely notice of appeal.

¶ 16                                II. ANALYSIS

¶ 17    On appeal, Wilson argues—as she did in the circuit court—that the Board's decision is against the manifest weight of the evidence, that *laches* should be applied, and that her termination was not for just or sufficient cause.

¶ 18                                A. *Laches*

¶ 19    We first address Wilson's argument that the doctrine of *laches* should have been applied to bar the Sheriff's complaint against her. She argues that none of the witnesses "could credibly remember this incident due to the passage of time," and other potential witnesses—such as Kashawn and her unidentified supervisor on July 18, 2011—did not testify. She asserts that "there is no competent evidence whatsoever of what occurred, and it is the Sheriff's knowing and voluntary delay in pursuing an investigation that caused this." She argues that (1) Queen filed her OPR complaint in September 2011, (2) OPR's investigation did not start until 2013, (3) OPR did not interview her until June 5, 2013, (4) the Board filed its complaint on April 21, 2014, and ( all of which undermined the witnesses' recollections of the events following July 18, 2011. We reject Wilson's *laches* argument.

¶ 20    *Laches* may be raised as an affirmative defense and is an equitable defense that may bar a plaintiff from obtaining relief due to the prejudice a defendant suffers because of an unreasonable delay in bringing an action. *Mo v. Hergan*, 2012 IL App (1st) 113179, ¶ 35. The party asserting

_____

does not advance any argument that the circuit court erred by reconsidering its finding the Board's decision to be void, and she does not advance any argument that the Board's March 5, 2015, decision was void.

*laches* must establish a plaintiff's lack of diligence in presenting its claim and prejudice to the defendant because of the delay. *Chisem v. McCarthy*, 2014 IL App (1st) 132389, ¶ 18. Courts are reluctant to impose *laches* on government entities, and the doctrine should only be applied against them under " 'compelling,' 'unusual[,] or extraordinary circumstances.' " *City of Countryside v. City of Countryside Police Pension Board of Trustees*, 2018 IL App (1st) 171029, ¶ 65 (quoting *Van Milligan v. Board of Fire & Police Commissioners of the Village of Glenview*, 158 Ill. 2d 85, 90 (1994)). "[T]he nonaction of government officials will not support a *laches* defense." *Wabash County v. Illinois Municipal Retirement Fund*, 408 Ill. App. 3d 924, 933 (2011). "Rather, *laches* will apply only if the government officials initiated an affirmative act that induced the opposing party to act, making it inequitable to permit the government entity to retract what the government officials have done." *Id.* at 933-34 (citing *City of Chicago v. Alessia*, 348 Ill. App. 3d 218, 229 (2004)). We ordinarily review a decision to apply *laches* for an abuse of discretion. See *Finley v. Finley*, 81 Ill. 2d 317, 330 (1980) ("*laches* is an equitable doctrine to be invoked or rejected in the trial court's discretion."); see also *Richter v. Prairie Farms Dairy, Inc.*, 2016 119518, ¶ 51 ("The applicability of *laches* to a given case lies within the discretion of the circuit court.").

¶ 21     The Sheriff argues on appeal that Wilson forfeited any *laches* argument by failing to raise it before the Board. The Sheriff contends that Wilson never filed any pleadings before the Board asserting the affirmative defense of *laches* and that the administrative record contains no mention of the doctrine. Wilson responds that her counsel argued the issue of timeliness in her opening statement to the Board by pointing out that two years had passed between the date of the incident and Wilson's interview with OPR. Wilson, however, fails to point to any portion of the administrative record that might establish that she sought to have the Sheriff's complaint dismissed or summarily denied due to the prejudicial passage of time. Her counsel's closing statement to the

Board at the hearing highlighted that two years passed between the incident and the OPR interview but did not argue that Wilson was prejudiced by the delay. Instead, counsel argued the merits of the Sheriff's complaint and challenged the credibility of the witnesses. Wilson argues on appeal that there was evidence of prejudice in the form of the witnesses having little to no independent recollection of the incident by the time OPR interviewed Wilson and the Board's hearing. The presence of some arguable evidence of prejudice, however, does not save Wilson from the fact that she never advanced any argument before the Board that she was prejudiced by any delay, and never requested any relief premised on prejudicial delay. In our view, Wilson did not adequately raise the issue of *laches* before the Board such that the Board would have reason to consider a *laches* defense. *Laches* is an affirmative defense that Wilson bore the burden of pleading and proving; by failing to raise the affirmative defense of *laches* and failing to raise any argument regarding prejudice before the Board, Wilson forfeited the issue of *laches* for our review. *In re Marriage of Heinrich*, 2014 IL App (2d) 121333, ¶ 44 (observing that *laches* must be pleaded and proved by the party seeking to raise it, and that absent an express pleading of the defense, the failure to advance any argument as to each element of a *laches* defense results in forfeiture).

¶ 22 Forfeiture aside, the administrative record does not support the application of *laches* to this matter. Queen filed her complaint with OPR two months after the incident. It is undisputed that there was a delay between Queen's OPR complaint and OPR's interview with Wilson. The Sheriff's complaint was filed four months after OPR concluded its investigation, Wilson was suspended the same month the Sheriff filed its complaint, and the Board held a hearing five months after the complaint was filed. Any delay between the incident and Wilson's OPR interview is nothing more than inaction on the part of OPR, and nonaction by a government entity is insufficient

11

to support the application of *laches*. *Wabash County*, 408 Ill. App. 3d at 933. We therefore reject

Wilson's argument that *laches* should have been applied to bar the Sheriff's complaint.

¶ 23                              B. The Board's Misconduct Findings

¶ 24    Next, Wilson argues that the Board's decision was against the manifest weight of the

evidence. On administrative review, we review the administrative agency's final decision, not the

circuit court's decision. *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d

368, 386 (2010). Our standard of review depends on the question presented. *Lopez v. Dart*, 2018

IL App (1st) 170733, ¶ 67. The degree of deference afforded to the Board's decision depends on

whether "the issue presented is a question of fact, a question of law, or a mixed question of law

and fact." *Horsehead Corp. v. Department of Revenue*, 2019 IL 124155, ¶ 27. The findings and

conclusions of the Board on questions of fact are considered *prima facie* true and correct. *Engle v.*

*Department of Financial and Professional Regulation*, 2018 IL App (1st) 162602, ¶ 30. We "will

not reweigh the evidence or substitute [our] judgment for that of the agency." *Id.* Instead, we

review whether the agency's findings of fact are against the manifest weight of the evidence. *Id.*

"An agency's finding is against the manifest weight of the evidence only if the opposite conclusion

is clearly evident." *Id.* When reviewing an agency's decision to terminate an employee, we employ

a two-step process. *Lopez*, 2018 IL App (1st) 170733, ¶ 68. First, we evaluate whether the agency's

factual findings are against the manifest weight of the evidence. *Id.*[4]

¶ 25    The Board's finding that Wilson violated the sheriff's general order 2.3(II)(E) was not

against the manifest weight of the evidence. The sheriff's general order 2.3(II)(E) requires in part

that all detainee cash "is to be recorded on the pre-numbered triplicate intake receipt form," the

receipt be signed by the trust officer and the detainee, and all receipt numbers be accounted for on

---

[4]We discuss the second step below. See *infra* ¶ 29.

a cash summary report with all voided receipts attached. Wilson testified that she told OPR that she realized there was a mistake after cashing out her drawer and there was a discrepancy between the amount of cash in her drawer and the total amounts on her receipts, and that she had given Kashawn "the wrong amount." She claimed that she told a supervisor and was instructed not to void out the $69 receipt. She testified that she retrieved the $69 receipt from Kashawn but did not create the receipt for $39 in Kashawn's presence and did not give him a copy of the $39 receipt. She testified that she gave the $39 receipt to her supervisor and "figured that they would handle it from there." Therefore, there was evidence before the Board that Wilson did not follow the sheriff's general order 2.3(II)(E) because the $39 receipt was not signed by Kashawn at the time his property was inventoried and that Kashawn was not given a copy of the $39 receipt when it was created. Furthermore, it is undisputed that two receipts were generated for the same inmate on the same day reflecting different amounts of cash and that neither receipt was voided and attached to the cash summary report. The Board's finding that Wilson violated the sheriff's general was not against the manifest weight of the evidence.

¶ 26     Wilson contends that there are serious evidentiary gaps because (1) Kashawn did not testify; (2) neither she nor Queen had an independent recollection of July 18, 2011, at the time of the hearing; and (3) no one, including Kramer, could determine who Wilson's supervisor was on July 18, 2011. She contends that there was no evidence that cash was not recorded on the intake receipt and no evidence that she "failed to 'void' one of the receipts." She asserts that there was simply a lack of evidence as to whether she voided any receipts for Kashawn. We note, however, that Wilson testified that she did not void any receipts for Kashawn, and Queen testified that she searched the IMAC system and did not locate any voided receipts generated by Wilson. None of Wilson's arguments are persuasive enough to find that the Board's finding is against the manifest

13

weight of the evidence. Kashawn's testimony was not necessary on this issue because Wilson's testimony was sufficient to show that she did not follow the sheriff's general order 2.3(II)(E) in creating the $39 receipt and that no voided receipts were created for Kashawn.

¶ 27     Next, the Board's finding that Wilson violated the sheriff's general order 4.1 governing internal investigations by making a false report is not against the manifest weight of the evidence. General order 4.1(III)(A)(17)-(18) provides that it is serious misconduct to engage in conduct unbecoming of an employee of CCDOC that tends to reflect discredit on the CCDOC or the Sheriff's office, and to make false official reports, either written or oral. Wilson contends that she gave "a good explanation" for the existence of the two receipts when she testified that she was "trying to single it out and trying to figure out who I issued the wrong amount of money to." The fact remains, however, that Wilson admittedly created two reports as to the amount of cash Kashawn had at the time he was processed on July 18, 2011. The $69 receipt was included in his inventory bag and the $39 receipt was given to the finance department. The Board concluded that Wilson was not credible when she testified that she was instructed by a supervisor not to void the $69 receipt because, "on the same date [July 18, 2011], she had a voided receipt (no. 529216) that was attached to the cash summary report." Wilson argues that there is no evidentiary support for the Board's credibility determination because "there is nothing in the record about what the receipt numbered 529216 even is." Queen testified, however, that Wilson voided a different receipt on July 18, 2011. Receipt#. 529216 is in the administrative record and clearly reflects the word "VOID" written on the receipt. There was at least some evidence in the record to show that Wilson had voided a receipt for a different inmate on July 18, 2011, and the Board's conclusion that Wilson's testimony that she was told not to void Kashawn's receipt was not credible is not against the manifest weight of the evidence. Furthermore, Cramer testified that the signature for Kashawn

on the $39 receipt was not consistent with his signatures on the $69 receipt and his grievance, suggesting that the $39 receipt was falsely created.[5] The Board's finding that Wilson created a false report by creating the $39 receipt and submitting it to the finance department while simultaneously failing to void the $69 receipt—thus creating two receipts for the same inmate on the same date, one of which was false—is not against the manifest weight of the evidence.

¶ 28    The Board's finding that Wilson violated sheriff's order 11.2.20.0 by making false statements to OPR is also not against the manifest weight of the evidence. One of the requirements of the sheriff's order is that officers be truthful during investigations. Wilson's sole argument on appeal is that the sheriff's order was not in effect in July 2011, but instead became effective in January 2013. Her argument, however, borders on frivolous given that she was charged with being untruthful during her OPR investigation for falsely claiming that Kashawn was carrying $39 and that she was not required to void the $69 receipt. Wilson's OPR interview indisputably took place in June 2013, when the sheriff's order was in effect. Wilson does not challenge any of the Board's factual findings and has not presented any argument that would lead us to conclude that the Board's decision was against the manifest weight of the evidence.

¶ 29                              C. Discipline Imposed

¶ 30    Finally, Wilson argues that her termination was not for just cause. We must determine whether the Board's factual findings "provide a sufficient basis for its conclusion that cause for discharge exists." (Internal quotation marks omitted.) *Lopez*, 2018 IL App (1st) 170733, ¶ 68. "Cause is defined as some substantial shortcoming that renders the employee's continued employment in some way detrimental to the discipline and efficiency of the service and something

_____

[5]We note that Cramer never gave any opinion as to who created Kashawn's signature on the $39 receipt; he merely observed that that signature was different. There was no testimony suggesting that Wilson forged Kashawn's signature, but Wilson herself testified that she filled out the receipt for $39 and allegedly gave that version of the receipt to a supervisor.

which the law and a sound public opinion recognize as a good cause for his no longer occupying the place." *Id.* ¶ 75 (citing *Walsh v. Board of Fire & Police Commissioners of Village of Orland Park*, 96 Ill. 2d 101, 105 (1983)). We will not reverse the Board's finding that cause exists to discharge an employee unless the Board's decision is unreasonable or unrelated to the requirements of service. *Id.* We have long held that a single violation of a single department rule may be sufficient grounds for discharge. See *Caliendo v. Martin*, 250 Ill. App. 3d 409, 418 (1993).

¶ 31     The Board's decision to terminate Wilson was not unreasonable or unrelated to the requirements of her service. After hearing all the evidence, the Board determined that Wilson violated three separate orders governing her position. Her violation of sheriff's order 4.1—making a false report—constituted serious misconduct, and it is evident that handling and properly accounting for detainee property—particularly cash—is a sensitive role implicating the public's trust in the sheriff's office and its correctional officers. Wilson does not direct our attention to any evidence suggesting that the Board has meted out different punishments to other officers found to have violated similar rules under similar circumstances. She asserts that Queen "would have issued Wilson a mere SPAR [summary punishment action request] for the error had she not been directed otherwise." She further asserts that Peterson testified that for first-time mistakes, she would "might try to talk to [the officer] to see what the problem is and how we can fix it." Contrary to Wilson's claim, Queen did not testify one way or the other as to what discipline she would have imposed if she had the authority to do so. And while there was testimony from Queen and Peterson that supervisors had the authority to impose lower levels of discipline, Queen testified that she was instructed by her superintendent to refer the matter to OPR and thus no longer had any authority to impose any discipline. Wilson does not assert that Queen's superintendent somehow exceeded his authority or acted arbitrarily when he ordered Queen to refer the matter to OPR. The Board

determined that serious misconduct occurred, and Wilson does not offer any persuasive argument that termination is not an available option to the Board upon a finding of serious misconduct.

¶ 32    We will not substitute our judgment for that of the Board's after determining that there was a factual basis for the Board's conclusion that cause for discharge exists. "It is only our purview to consider whether the Board's punishment was unreasonable given the circumstances, not whether we would have imposed a more lenient sentence." *Chisem*, 2014 IL App (1st) 132389, ¶ 25.

¶ 33                                III. CONCLUSION

¶ 34    For the foregoing reasons, the Board's final administrative decision is affirmed, and the judgment of the circuit court affirming the Board's decision is also affirmed.

¶ 35    Affirmed.